1  | MORRIS POLICH & PURDY LLP
2  | David J. Vendler, Esq. (SBN 146528)
   | Email:     dvendler@mpplaw.com
   | 1055 West Seventh Street, Suite 2400
3  | Los Angeles, California 90017
   | Tel.:  (213) 417-5100
4  | Fax:   (213) 488-1178

5  | MICHAEL R. BROWN, APC
   | Michael R. Brown, Esq. (SBN 65324)
6  | Email:     mbrown@mrbapclaw.com
   | 18101 Von Karman Avenue, Suite 1940
7  | Irvine, California 92612
   | Tel.:  (949) 435-3888
8  | Fax:   (949) 435 3801

9  | Attorneys for Plaintiffs, Lora Smith,
   | Cynthia Himple, and all others similarly situated
10

11            UNITED STATES DISTRICT COURT

12            CENTRAL DISTRICT OF CALIFORNIA

13

| | |
|---|---|
| LORA SMITH and CYNTHIA HIMPLE, individually, and on behalf of the class of all others similarly situated, | Case No.: |
| Plaintiffs, | **CLASS ACTION COMPLAINT FOR:** |
| vs. | 1. **BREACH OF CONTRACT** |
| BANK OF AMERICA, N.A., a national banking association, | 2. **BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING** |
| Defendant. | 3. **VIOLATION OF UNFAIR COMPETITION LAW** |
| | 4. **DECLARATORY RELIEF** |
| | 5. **FRAUD** |
| | 6. **VIOLATION OF 26 U.S.C. § 6050H** |
| | **DEMAND FOR JURY TRIAL** |

NOW COME plaintiffs Lora Smith and Cynthia Himple ("plaintiffs"), on behalf of themselves and all others similarly situated (collectively "class members"), and complain as follows against defendant Bank of America, N.A. a national banking association, ("BANA" or "defendant").

## I.

## SUMMARY OF THE ACTION

1.     For almost all owners of real property, the mortgage interest deduction is their largest single tax deduction and can amount to hundreds, thousands, or even tens of thousands of dollars per year in tax savings.  Borrowers typically send a single payment to their lender, who then allocates the money received to interest, principal and to other amounts that may be owing.  Mortgage interest is the portion of the monthly payment made to a lender that is, subject to certain limitations, deductible from gross income pursuant to 26 U.S.C. § 163(a).  At the end of each calendar year, lenders are required to send to their borrower-taxpayer and to the Internal Revenue Service ("IRS") a Form 1098 reporting the amount of mortgage interest the borrower has paid to the lender. The statute that requires lenders to issue Forms 1098 is 26 U.S.C. § 6050H.  It states very simply that lenders must report on Forms 1098 the amount of mortgage interest they "receive" during a given calendar year, if that amount is over $600.[1]

2.     Tax-payer-borrowers, the IRS, and accounting professionals all rely on lender-issued IRS Forms 1098 to determine the amount of mortgage interest that tax-payer-borrower(s) have paid during a given year so as to know how much can be deducted from gross income.   Without any explanation, for at least the past four years BANA has been systematically, knowingly, and intentionally under-reporting on Forms 1098 hundreds of millions, if not billions, of dollars in mortgage interest that it has *actually received* from borrowers to whom it granted "loan modifications."  It is

---

[1] Reporting is optional if the amount is less than $600.

alleged on information and belief that although BANA is aware that its failure to report all mortgage interest received from borrowers precludes its borrowers from receiving the full mortgage interest deduction to which they are entitled, it is doing so to maximize its own profits by hiding its own income and/or to making its internal interest accounting simpler and less expensive.

3.     Following the financial crisis of 2008, many of BANA's borrowers fell into financial distress and were having difficulty keeping current with their mortgage obligations.  An alternative to foreclosure and/or potential bankruptcy was for them to seek a loan modification from BANA.  It is further alleged on information and belief that in 2009, BANA commenced an aggressive program to solicit thousands of their current borrowers to modify their existing loans.

4.     Loan modifications are written agreements between BANA and a borrower to "modify" the terms of the borrower's original note ("original note"). Loan modifications are not refinances.   No additional money is advanced to the borrower and the original note is not paid off or cancelled.   Only certain terms of the original note are amended, with the balance of the terms remaining unchanged and the same deed of trust continuing to secure the note after the modification.  The same loan number also continues to be used by BANA post-modification for the very reason that the loan is only being modified and not replaced.  Further, BANA's loan modification agreements all contain the following language or its functional equivalent: "nothing in this agreement (sic)[2] shall be understood or construed to be a satisfaction or release in whole or in part of the Note or Security Instrument.  Except as otherwise specifically provided for in the Agreement, the Note and Security Instrument will remain unchanged."

5.     The deeds of trust that accompany the loan notes also all contain language recognizing that loan modifications are only modifications of existing debt and not new extensions of credit.  Specifically, they all contain the following language

---

[2] As a defined term, the word "agreement" should have been capitalized.

or its functional equivalent: "Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower."[3]

6.    Among the most significant terms that are frequently modified from the original notes are: (1) the interest rate to be charged; (2) the length/term of the loan; (3) that pre-existing (unpaid) interest will be "capitalized," meaning that after modification interest will be charged on both previously unpaid interest in addition to the original principal amount;[4] and (4) where the original note was an Option Arm note that provided the borrower with several choices of how much to pay in a given month, the modified loan eliminated those choices and put in its place a schedule of defined payments.

7.    At the time borrowers apply for their loan modifications, the borrower's total debt obligation to BANA invariably includes both unpaid principal and unpaid

---

[3] Case law is uniform that loan modification agreements are not new extensions of credit, but are, just as the title implies, modifications to the terms of an existing loan.  See, generally, *Central Bank of Kansas City v. Perry*, 427 S.W.3d 285 (Mo.App. W.D. 2014) (loan modification is not a new loan); *In re Hart*, 246 B.R. 709, 738 (Bankr.D.Mass.2000) (same); *Diamond v. One West Bank*, 2010 WL 1742536 (D.Ariz. 2010) ("A loan modification does not require additional TILA disclosures, particularly where no new monies are advanced."); *Sheppard v. GMAC Mortg. Corp.*, 299 B.R. 753, 760–63 (Bankr.E.D.Pa.2003) (same); *Castrillo v. Am. Home Mortg. Servicing, Inc.*, 670 F.Supp.2d 516, 528 (E.D.La.2009) (same.); *Washington v. Natl. City Mortg., Co.*, 2011 WL 1842836 (N.D. Cal. 2011) (same); and *Green v. CitiMorgage, Inc.*, 2011 WL 5866230 (W.D.Vir. 2010)(same).

[4] BANA's position is that capitalization of pre-existing interest operates to change its character from mortgage interest to principal.  (See Exhibit "F" attached hereto).  Tax law does not support this.  "Interest" is money that is charged for the use of money.  As stated in *Motel Corporation v. Commissioner of Internal Revenue*, 54 T.C. 1433 (1970) "we can perceive no reason why defaulted . . . [or deferred] . . . interest should be transformed into principal for purposes of tax law.  Such interest, no matter when paid, is clearly compensation for the use of money, and its character as such does not change merely because it is not timely paid." The only effect of capitalization of pre-existing unpaid interest is that it allows interest to be charged on the pre-existing unpaid interest.  It does not change the character of that interest.

-4-

interest.[5]   This is because borrowers seeking loan modifications are often many months behind on their payments or had Option Arm loans that allowed them to defer interest payments.   As a result, at the time class members' loan modifications became effective, their debt to BANA included thousands, or even tens of thousands, of dollars of accrued but unpaid interest.   Because this accrued but unpaid interest was charged to the borrower for the borrower's use of the original principal, it is "mortgage interest" and payments towards that unpaid interest should have been reported by BANA on Form 1098 pursuant to 26 U.S.C. Section 6050H.[6]

8.   But like the alchemist trying to turn lead into gold, BANA is using an accounting sleight of hand to "convert" its borrowers' accrued interest into "principal," and then wiping the borrower's accrued interest off its books for Form 1098 reporting purposes.   But, under bedrock tax law, interest charged on a loan simply cannot be transformed into "principal" no matter what esoteric accounting device is used.[7]

9.   Adding to the wrongfulness of BANA's conduct is that BANA implemented its "interest elimination" policy with absolutely no notice to its borrowers that a consequence of their entering into a loan modification with BANA

---

[5]  Often the interest owed will be comprised both of past due interest as well as current interest, i.e. interest that has accrued, but where that month's payment date has not yet arrived.

[6]  See *Smoker v. C.I.R.*, 2013 WL 645265 (Tax Ct. 2013) which squarely holds that deferred interest does not lose its character as mortgage interest simply because it is added to principal.   "Whether interest is charged by way of an original issue discount (OID) (i.e., interest withheld from the loan proceeds) or as capitalized interest (i.e., periodic interest added to the loan's principal), the economic reality is the same: the borrower is able to postpone paying the interest due to sometime in the future, either over the life of the loan or as part of a balloon payment upon maturity." *Id.* at *4

[7]  *Old Colony R. Co. v. Commissioner of Internal Revenue*, 284 U.S. 552, 561 (1932) ("[W]e think that, in the common understanding, 'interest' means what is usually called interest by those who pay and those who receive the amount so denominated in bond and coupon, and that the words of the statute permit the deduction of that sum, and do not refer to some esoteric concept derived from subtle and theoretic analysis.")

would be that they would forever lose the opportunity to deduct their accrued interest when they eventually did pay that interest back.

10.     An example best makes the point of what BANA is doing wrong. Assume that as of January 1, 2012, John Doe has a mortgage loan with BANA on which he owes $600,000 in principal and that his monthly interest obligation is 10% *per anum*, or $5,000 per month.

11.     During 2012, Mr. Doe experiences financial difficulty, falls behind on 4 months of payments ($20,000 worth of interest), and requests a loan modification from BANA.  Because of the processing time between Mr. Doe's application and the grant of his loan modification, another 8 months pass without any further payment by Mr. Doe ($40,000 in interest).  Thus, as of January 1, 2013, the effective date of Mr. Doe's loan modification, his loan balance consists of $600,000 in original principal and $60,000 in unpaid interest.

12.     Under the terms of the modified loan, Mr. Doe is provided a reduced interest rate of 3% per year.  However, per the loan modification agreement, interest will not only be charged on the original $600,000 principal, but also on the $60,000 in previously deferred interest.[8]  Further, the loan modification agreement provides that the loan will be re-amortized to be repaid in full (principal and interest) over a new 30-year period beginning on the date the modification becomes effective.  This means that Mr. Doe's new monthly payment includes two components; (1) $1,650[9] in interest for the month in which the payment is made ("current interest") and (2) an additional sum sufficient to result in the repayment of the modified loan balance amortized over the new 30-year term.  For the purposes of this example, assume that that this amount averages $350 per month for all of 2013.  Thus, Mr. Doe's total payments to BANA for 2013 total $24,000.[10]

---

[8] This is called capitalization of interest. This is permissible.

[9] 3% of $60,000 divided by 12 months = $1,650 per month.

[10] $2,000 per month x 12.

**CLASS ACTION COMPLAINT**

13.    Under BANA's current (wrongful) Form 1098 reporting policy, BANA reports only Mr. Doe's payment of current interest ($1,650 x 12 months = $19,800) on Mr. Doe's Form 1098.  As to the additional $4,200 ($350 x 12 months) that Mr. Doe paid in 2013 toward reducing the $670,000 post-modification loan balance, BANA counts this entire amount as a repayment of supposed "principal" and does not report any of it on Form 1098.  While certainly simple and straightforward, this does not make BANA's calculation correct.

14.    The reason that BANA's policy is wrong is that it fails to take into account that $60,000 of Mr. Doe's $660,000 post-modification loan balance is itself interest, i.e. money that BANA charged Mr. Doe for the use of BANA's original principal.    In fact, BANA's standard loan modification agreements all expressly recognize this fact when they state the following, or its functional equivalent: "The amount payable under the Note or Security Instrument (the "Unpaid Principal Balance") [11] is $_____, *consisting of the amount(s) loaned to Borrower by Lender, **which may include**, but are not limited to any past due principal payments, **_interest_**, fees, and/or costs capitalized to date*."  (Emphasis supplied).

15.    The crux of this lawsuit is that to the extent Mr. Doe repays BANA such "past due" "interest," BANA is required report its receipt of those amounts on Mr. Doe's Form 1098 pursuant 26 U.S.C. § 6050H.  But BANA is not doing so

16.    In the example above, there is no dispute that the $19,800 Mr. Doe paid in current interest is interest.  But, in addition to that money, plaintiffs contend that because Mr. Doe owed $60,000 in past due interest at the time of his loan

---

[11]  Significantly, the reference to ("Unpaid Principal Balance") in the loan modification agreement is not a substantive term.  It is just a shorthand reference to "the amount payable under the Note or Security Instrument," which the modification agreement expressly states includes interest.  The mere use of the word "Principal" in this shorthand reference does not, and cannot under well-established tax law, convert the interest existing at the time of the modification into something other than interest.

modification which was not forgiven, the $4,200 Mr. Doe paid in 2013 should also be included in any Form 1098 issued by BANA.

17.    The foundation for this conclusion comes from the allocation provisions in BANA's original loan agreements, which contain the following language, or its functional equivalent: "Each monthly payment will be applied as of its scheduled due date, and if the payment includes both Principal[12] and interest, it will be applied to interest before Principal."

18.    BANA's standard deed of trust agreements similarly state the following, or its substantial equivalent: "Except as otherwise described…, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) [escrow items such as mortgage insurance]." [13]

19.    Because the payment allocation provisions in BANA's notes and deeds of trust require payments to be allocated first to repayment of outstanding interest, and only then to principal,[14] Mr. Doe's post-modification payments to BANA must be applied in this way.  But BANA is not doing so.

20.    In the example above, Mr. Doe's loan modification agreement requires him not only to pay interest on his modified loan balance (current interest), but he also must repay the past due interest that was made part of his modified loan balance.  But since both of these obligations are for the payment of interest, any payments Mr. Doe makes must be allocated to retire these sums before they can be applied to retire Mr. Doe's principal.

---

[12] The term "Principal" is defined to include the amount originally loaned to the borrower.

[13] These terms are consistent with the general rule in tax law that partial payments in satisfaction of a debt are first applied toward the reduction of interest, and only then toward repayment of principal.  See *Estate of Paul M. Bowen v. Commissioner*, 2 T.C. 1 (1943).

[14] BANA's standard loan modification agreements do not modify the payment allocation provisions of the original notes and thus continue to control.

21.     Therefore, instead of issuing a Form 1098 for $19,800, BANA should have allocated the entirety of Mr. Doe's payment to the repayment of both current interest *and past due interest* and issued Mr. Doe a Form 1098 for 2013 in the amount of $24,000.   And, in succeeding years, BANA should continue to apply **all** of Mr. Doe's payments to interest until the entire $60,000 in past due interest has been fully paid. [15]

22.     Alternatively, even if the interest allocation provisions of BANA's original notes and deeds of trust are found not to control for any reason, BANA still cannot simply eliminate the $60,000 in past due interest that existed at the time of Mr. Doe's loan modification.   At a minimum, it must pro-rate Mr. Doe's payments so that 10% of the $4,200 payment he made toward retiring the $660,000 post-modification loan balance ($60,000 of which – 10% – is interest) should have been reported on Form 1098 as interest along with the $19,800 in current interest.   This works out to a total of $20,220.   See, *Bayou Verret Land Co., Inc. v. Commissioner of Internal Revenue*, 52 T.C. 971 (1969).

23.     But, as has been demonstrated, no matter which method is ultimately adjudicated to be the correct one, BANA's method is wrong and will, over the course of his loan, cost Mr. Doe $60,000 in tax deductions he is legally entitled to take.

24.     On information and belief, BANA knows that its policy is wrong, but implemented it in spite of that knowledge to accomplish its goals of both hiding income by converting interest paid to it by its borrowers (which is income to BANA)

---

[15] This is also consistent with well-established tax law.   In the student loan context, where interest payments are also regularly deferred, the IRS instructs that all interest payments, including payments of capitalized interest must be reported.   See Instructions for Forms 1098-E and 1098-T -- Student Loan Interest Statement and Tuition Statement and IRS Publication 970. There is simply no basis to distinguish how lenders should report on Forms 1098 repayments of previously deferred capitalized interest in the home mortgage context under 26 U.S.C. § 6050H and repayments of previously deferred capitalized interest in the student loan context under 26 U.S.C. 6050S.   In both contexts, the money being repaid is money that was charged for the use of money and is therefore deductible interest.   See also Rev. Rul. 70-647, 1970-2 C.B. 38.

1  into (supposed) principal (which is not income to BANA) and to simplify its Form

2  1098 reporting calculations to reduce costs.

3      25.   Further, BANA has actively concealed its wrongful reporting policy from

4  its borrowers.  BANA knew at the time it instituted the policy of not reporting its

5  receipt of unpaid interest that its borrowers would lose a substantial tax deduction

6  benefit.  Now that its borrowers have discovered this concealed practice, BANA's

7  borrowers face substantial losses.  Because there is a three-year statute of limitations

8  for amending tax returns under 26 U.S.C. § 6511, BANA's intentional concealment of

9  its improper and illegal reporting practices has not only caused tens of thousands of

10  tax-payers to unknowingly file erroneous tax returns which will have to be unwound

11  at substantial cost, but has also potentially caused class members the damage of

12  *permanently* losing valuable tax deductions that they can now only recover from

13  BANA.

14

15                                        II.

16  **THE 2008 FINANCIAL CRISIS RESULTS IN VAST NUMBERS OF LOAN**

17                              **MODIFICATIONS**

18      26.   In or about 2002-2007 traditional underwriting guidelines for obtaining

19  home loans were relaxed substantially and there was a general a push in the lending

20  industry to "close loans."  Long-term risk was subjugated to immediate gain.  New

21  types of loan products were marketed by the lending industry to the sub-prime market,

22  such as "Option Arm" loans and loans with artificially low "teaser rates" that allowed

23  potential borrowers to lower their monthly payments in the short term, and thus

24  "afford" a house they otherwise could not.  The pressure to sell ultimately resulted in a

25  great number of risky loans being made to persons who would not have qualified in

26  prior years using traditional underwriting guidelines.

27      27.   Many of these sub-prime loans were then sold by their initial issuers and

28  packaged into investment vehicles known as Residential Mortgage-Backed Securities

("RMBS").  In these investment vehicles, a special purpose entity would be set up to own the packaged mortgages.  Shares of the entity (or a grouping of similar entities) that owned the RMBS were then sold to investors.

28.    At the center of this brewing storm was Countrywide Financial Corporation.  In 2006, for example, Countrywide financed approximately 20% of all mortgages in the United States.  Many of these were sub-prime loans.

29.    In 2008, the freewheeling mortgage underwriting of earlier years came to a head with unprecedented numbers of defaulting loans.  This in turn led to the collapse of Countrywide and the near collapse of several investment banks that had acquired large portfolios of RMBS.  These failures and near failures catapulted America into a financial crisis.

30.    In July of 2008, just as the financial crisis was beginning to unfold, BANA acquired Countrywide which, at the time, was on its way to failure.

31.    BANA is one of the nation's leading federal savings banks.  As part of its business, it has originated (or acquired from Countrywide and other lenders) hundreds of thousands, if not millions, of mortgage loans, both in California and nationally. While the specific repayment terms may vary, each of these loans provides that the borrower will, in some form or another, pay interest over the course of the loan in exchange for the borrower's use of the borrowed funds.

32.    As the financial crisis worsened over the course of 2008 and 2009, the broader American economy also faltered.  Many consumers lost their jobs and in most areas, local housing markets suffered substantial reversals.  This left many homeowners who were over-leveraged to begin with, unable to continue to pay their mortgages, or unwilling to do so because their homes were now "underwater."  As the level of borrower defaults increased, so did the rate of foreclosures, which in turn increased the downward pressure on real estate prices.

33.    Beginning in or about 2009, banks like BANA realized that at least in certain circumstances, it was better for them to renegotiate the terms of borrower loans

1   – and thus keep an income stream going – than to foreclose and try to sell the

2   foreclosed property for a loss in a downward-spiraling real estate market.

3       34.    In or about 2009 BANA began to aggressively pursue loan modifications

4   in situations where BANA felt the circumstances were appropriate for it to do so.

5   Plaintiffs loans were both modified during this period.  It is alleged that hundreds of

6   thousands of persons like plaintiffs also had their loans modified by BANA.

7       35.    Loan modifications were uniformly accomplished through an

8   addendum/amendment to the original note loan agreement.  In short, the original note

9   loan agreement would survive, but certain of its terms, such as the interest rate to be

10  charged and/or the term of the loan, were changed.  True and correct copies of

11  Plaintiff Himple's original note, deed of trust, and her loan modification agreement

12  are attached hereto as Exhibits "A", "B", and "C" and incorporated herein as though

13  set forth in full by this reference.  True and correct copies of Plaintiff Smith's original

14  note and her loan modification agreement are attached hereto as Exhibits "D" and "E"

15  and incorporated herein as though set forth in full by this reference.  Plaintiff Smith is

16  not in possession of a copy of the deed of trust securing her property.  However she

17  alleges on information and belief that for the purposes of the issues raised in this case,

18  its terms are substantially equivalent to the terms of plaintiff Himple's deed of trust,

19  i.e. in allowing the underlying note to be modified and that there is no language

20  inconsistent with allocating payments to interest before principal.

## III.

## PLAINTIFFS' INDIVIDUAL LOAN HISTORIES AND PAYMENTS OF MORTGAGE INTEREST THAT WERE NOT CORRECTLY REPORTED BY BANA ON FORM 1098

### A.   Cynthia Himple

27      36.    On or about February 13, 2007, Plaintiff Himple obtained a mortgage

28  loan from Flagstar Bank, FSB in the amount of $500,000 on her principal residence

located at 10963 Sheland Ave., Montclair, California 91763.  Plaintiff Himple's loan was originally an Option Arm loan, where Ms. Himple was allowed the option to pay less than the full interest due in a given month and to defer the payment of that interest to a later time.  The loan number for her loan was 168522731.  Her deed of trust states in paragraph 2 that: "except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; and (c) amounts due under Section 3…   Her deed of trust also provides that ""Except as otherwise described…, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) [escrow items such as mortgage insurance]."

37.   At some point after 2007, plaintiff Himple's mortgage was acquired by Countrywide Financial Corporation.  BANA then acquired plaintiff Himple's loan as part of its acquisition of Countrywide Financial Corporation.  At the time BANA acquired plaintiff Himple's mortgage, her loan balance was already $538,010.09, or $38,010.09 over the original $500,000 principal.  With the exception of $354.16 in late charges, the entirety of this $38,010.09 was deferred interest as a result of negative amortization.

38.   In late 2009, plaintiff Himple experienced financial distress and fell behind on her mortgage payments. She never made any repayment of previously deferred interest and was barely current with the accruing monthly interest.  Plaintiff Himple did not make any payments to BANA in 2010 while she sought to obtain a loan modification.

39.   In or about May 2011, BANA and plaintiff Himple entered into a loan modification trial period agreement.  This agreement provided that if she paid the trial payments for 3 months and performed all other requirements of her during this period she would be eligible for a loan modification.  Plaintiff Himple complied with all the requirements and qualified for  a permanent loan modification by BANA

40.    At the time that plaintiff Himple entered into the formal loan modification agreement in or about November 2011, the balance due on plaintiff Himple's loan, according to BANA, was $617,501.68.[16] This amount consists of the $500,000 original principal, the $38,010.09 in deferred interest that constituted negative amortization pursuant to her Option Arm loan prior to her default, with the balance consisting of unpaid interest that arose after her default and through the date of modification.[17]

41.    The loan modification agreement continued to reference 168522731 as the loan number.   No new loan number was created post-modification.   BANA continues to use this same loan number.

42.    One term of the loan modification agreement was to require plaintiff Himple to make regular principal and interest payments throughout her new repayment period according to a fixed schedule.   As such, her loan ceased to be an Option Arm loan from the date of the modification.   The loan now became what is commonly known as a "fixed rate" loan. During the trial period, and since entering into her actual loan modification agreement, plaintiff Himple has made all payments required of her.

43.    Plaintiff Himple is a cash-basis, as opposed to an accrual basis, tax payer. Virtually all individuals are cash basis taxpayers.

44.    During tax-year 2012, plaintiff Himple made 12 payments under her modified loan agreement totaling $45,754.93. As of January 1, 2012, her loan balance was approximately $614,500, or $114,500 above the original $500,000 principal amount.   Virtually the entirety of this $114,500 was mortgage interest that BANA (or prior lenders from whom BANA purchased Himple's loan) charged plaintiff Himple

---

[16] Because of the loan modification trial period, plaintiff Himple does not have records sufficient to identify exactly how BANA calculated this sum.

[17] Plaintiff Himple believes that a few hundred dollars of the $617,501.68 consists of late fees. This amount is de minimis.

1  for the use of the original $500,000 principal.  As such, to the extent Ms. Himple

2  made any payments to BANA after her loan modification and prior to retiring the full

3  $114,500 in deferred and unpaid interest, the entirety of those payments should have

4  been reported on plaintiff Himple's Form 1098 based on the "interest before

5  principal" allocation provisions in her note and deed of trust. [18]

6      45.   At a minimum, BANA should have provided here a Form 1098 that pro-

7  rated her payments between the $500,000 in principal and the $114,500 in deferred

8  and unpaid interest existing on her loan.  Under this approach, approximately 23% of

9  the amount that BANA allocated to repayment of principal should have been allocated

10  to interest and reported on plaintiff Himple's Form 1098.

11      46.   But instead of either of the above approaches, on plaintiff Himple's Form

12  1098 for tax year 2012 BANA did not report anything other than the current interest

13  she paid during 2012.

14      47.   At no time prior to entering into the loan modification, nor indeed in any

15  of the loan modification documents that were sent to plaintiff Himple, did BANA

16  explain or disclose to plaintiff Himple that by entering into a loan modification with

17  BANA, she would be forever losing the opportunity to deduct the deferred and unpaid

18  interest she had accrued.  Nor would any reasonable borrower anticipate this would be

19  the result of entering into a loan modification agreement since the loan modification

20  was just that, a modification of the already existing loan.  BANA's failure to disclose

21  its secret intent to wipe the interest off of its books by converting it into supposed

22  "principal" was wrongful and fraudulent and done for its own benefit to the detriment

23  of plaintiff.

24

25

26  [18]  A few hundred dollars of the $614,500 January 2012 loan balance may have been attributable to late fee charges.  But given that payments are to be allocated to interest before

27  principal or other charges, it makes no difference to the above analysis whether a small percentage of the $614,500 loan balance at the commencement of 2012 did not constitute

28  interest.

**CLASS ACTION COMPLAINT**

48.     During tax year 2011 and 2013, BANA also used the same wrongful method to calculated plaintiff Himple's interest payments.  Plaintiff is also of the belief that BANA continues to pursue its wrongful interest calculation method and will thus repeat its error for 2014 and all succeeding years such that even if plaintiff Himple pays off her loan entirely, BANA will never report any of the interest that she had accrued prior to her loan modification.

**B.     Lora Smith**

49.     On or about August 9, 2006, plaintiff Smith obtained a mortgage loan from Advantix Lending, Inc. in the amount of $376,000 on her principal residence located at 25722 Lupita Drive, Santa Clarita, California.  Plaintiff Smith's loan was originally an Option Arm loan where Ms. Smith was allowed the option to pay less than the full interest due in a given month and to defer payment of that interest to a later time.  Plaintiff Smith alleges that her note provides that "each monthly payment will be applied… to interest before principal."  Plaintiff Smith also alleges her deed of trust provides language to the same effect.

50.     At some point after entering into her loan, plaintiff Smith's mortgage was acquired by Countrywide Financial Corporation.  BANA then acquired plaintiff Smith's loan as part of its acquisition of Countrywide Financial Corporation.  At the time BANA acquired plaintiff Smith's mortgage in 2009 it assigned it loan number 129906299. At the time BANA took over plaintiff Smith's loan, her loan balance was $403,573.91, or $27,573.91 over the original $376,000 principal.  The entirety of this $27,573.91 was deferred interest as a result of negative amortization.  During 2009, plaintiff Smith continued to accrue additional deferred interest to the point where her loan balance at the end of 2009 was $404,695.52, which included $28,695.52 in deferred interest.

51.     In 2009, plaintiff Smith began to experience financial distress and sought then to modify her loan with BANA.  BANA told her that before she could qualify for

a loan modification, she would have to fall at least three months behind on her mortgage. She did so.

52.   In approximately October 2009, BANA put plaintiff Smith on a three-month trial program for a loan modification. Plaintiff Smith made her payments under the trial program and in or about February 2010 her loan modification was granted.

53.   At the time plaintiff Smith's loan modification became effective, BANA capitalized her entire loan balance – which BANA's modification agreement specified included unpaid interest and other charges such as property tax and insurance payments that had been charged by BANA when plaintiff Smith was in default. BANA kept plaintiff Smith's original loan number post-modification.

54.   At the time that plaintiff Smith formally entered into the loan modification agreement, the total balance due on her loan, according to BANA, was $413,558.13.[19]   This amount consists of the $376,000 original principal, the $28,695.52 in interest that was deferred and constituted negative amortization pursuant to her Option Arm loan prior to her default, with the balance consisting of taxes, insurance and unpaid interest that arose after her default. BANA refers to this amount in its loan modification agreement as New Principal Balance. Again, BANA specifically recognizes in the modification agreement that the "New Principal Balance" includes "all amounts of arrearages that will be past due as of the Modification Effective Date (**including unpaid and deferred interest**,[20] fees, escrow advances and other costs).

---

[19] Again, because of the loan modification trial period, plaintiff Smith does not have records sufficient to identify exactly how BANA calculated this sum.

[20] While the distinction is made in BANA's loan modification agreement between "deferred interest" and "unpaid interest," the distinction is one without a difference for purposes of this case. The former refers to negative amortization accrued by the borrower electing to make minimum payments under their Option Arm loan, while the latter refers to interest accrued by a borrower as a result of being in default, i.e. not making their payments. But for purposes of tax law, interest is simply money charged for the use of money; both types of interest are thus reportable on Form 1098 and deductible under 26 U.S.C. Section 163(a).

-17-

55.     Among the other terms of the loan modification agreement was to eliminate the payment "option" features of plaintiff Smith's original note. Specifically, her loan modification agreement states: "I understand that, if I have a pay option adjustable rate mortgage loan, upon modification, the minimum monthly payment option, the interest-only, or any other payment options will no longer be offered and that the monthly payments described in the above payment schedule for my modified loan will be the minimum payment that will be due each month for the remaining term of the loan.  My modified loan will not have a negative amortization feature that would allow me to pay less than the interest due resulting (sic) any unpaid interest to be added to the outstanding principal balance."  As such, her loan ceased to be an Option Arm loan from the date of the modification.  The loan now became what is commonly known as a "fixed rate" loan.  Plaintiff Smith's loan modification agreement further provides that of the total $413,558.13 loan balance, BANA would defer collecting $67,077.48 and make that obligation a "balloon" payment due when she sold or refinanced her loan, or at the conclusion of her payment schedule. Additionally, BANA's loan modification agreement specifies that it would not charge interest on this amount.  As to the $346,480.67 balance – what BANA refers to as the "Interest Bearing Principal Balance" – BANA amortized this amount over 40 years at varying interest rates over a fixed payment schedule – the first five years at 2% interest; year six at 3%; year 7 at 4%; and years 8-40 at 5%).

56.     Plaintiff Smith has made all payments required of her under her modified loan agreement.

57.     Plaintiff Smith, is a cash-basis, as opposed to an accrual basis, tax payer.

58.     As an example to illustrate the effect on Ms. Smith from what BANA is doing wrong, during tax-year 2011, plaintiff Smith made 12 payments under her modified loan agreement totaling $17,457.06.  But for tax year 2011, BANA only reported on plaintiff Smith's Form 1098 that she had paid $6,764.01 in mortgage interest.  BANA's calculation is wrong.

59.    As of January 1, 2011, plaintiff Smith's loan balance was still well in excess of the $376,000 original principal plaintiff Smith had borrowed.  As stated, BANA's loan modification agreement specifically states that that the excess above plaintiff Smith's original principal balance – what BANA refers to as the "modified Principal balance" – is comprised, in part, of past due interest.  And, since any payments are required by the term of plaintiff Smith's note, (and by tax law generally), to be applied to interest before principal, the entirety of her mortgage payments for 2011 should have been applied toward reducing plaintiff Smith's current and past due interest and not to "principal."  So, as a result of BANA's wrongful calculation method, plaintiff Smith's 2011 Form 1098 was understated in the amount of $10,693.05.

60.    At a minimum, even if BANA's interest-before-principal allocation provisions are not given effect, BANA should still have provided her a Form 1098 that pro-rated her payments between the $376,000 in principal and (at least) the $28,695.52 in past due and deferred interest that existed on the loan at the time the modification became effective.

61.    During tax year 2010, 2012 and 2013, BANA also used the same wrongful method to calculate plaintiff Smith's interest payments.  Plaintiff Smith is also of the belief that BANA continues to pursue its wrongful interest calculation method and will thus repeat its error for 2014 and all succeeding years such that even if plaintiff Smith pays off her loan entirely, BANA will never report any of the interest that she had accrued prior to her loan modification and that this applies to all class members.

62.    At no time prior to entering into the loan modification, nor indeed in any of the loan modification documents that were sent to plaintiff Smith, did BANA ever explain or disclose to plaintiff Smith that by entering into a loan modification with BANA, she would be losing the opportunity to deduct the interest she had accrued on her original loan.  Like plaintiff Himple, plaintiff Smith further alleges that BANA did

1    not disclose this to any of its loan modification borrowers.  Nor would any reasonable

2    borrower anticipate this would be the result of entering into a loan modification

3    agreement since the loan modification was just that, a modification of the already

4    existing loan.  BANA's failure to disclose its secret intent to wipe clean the interest

5    off of its books and convert it into principal was wrongful and fraudulent and done for

6    its own benefit to the detriment of plaintiff Smith and all persons similarly situated.

7

8    **IV.**

9    **BANA KNOWS FROM A PRIOR LITIGATION THAT DEFERRED**

10    **INTEREST HAS TO BE REPORTED ON FORMS 1098, BUT CONTINUES IN**

11    **ITS WRONGFUL POLICY WITH RESPECT TO ITS PORTFOLIO OF**

12    **MODIFIED LOANS**

13      63.    Plaintiffs allege that prior to 2014, BANA was sued by two of its

14    borrowers holding Option Arm loans for failing to report borrower-payments of

15    previously deferred interest on its portfolio of Option Arm loans.  BANA settled that

16    case in 2014 by agreeing, among other terms and conditions, to change its interest

17    reporting policy prospectively for its Option Arm loan holders such that starting in

18    2014 (for tax year 2013 Forms 1098) it would report on Forms 1098 those borrowers'

19    payments of previously deferred interest.  BANA also agreed to issue corrected Forms

20    1098 for tax years 2010-2012 adjusting the amounts of interest it had previously

21    reported to include any repayments of previously deferred interest that its Option Arm

22    borrowers had made during those years.  Finally, BANA agreed to pay money to

23    certain of its Option Arm borrowers who had paid deferred interest to BANA in 2009.

24    The settlement agreement specifically limited the scope of the class to include only

25    persons holding Option Arm loans with BANA.

26      64.    Plaintiff Smith alleges that although her loan was originally an Option

27    Arm loan, she was not a member of either of the above classes because she did not

28

1    pay any previously deferred interest to BANA until the point of her loan modification

2    and any payment of interest was made on the modified fixed rate loan.

3         65.    By virtue of having recognized that there is a reporting error in its

4    practice, and investigating the propriety of its reporting practice on mortgage interest,

5    BANA's continued improper reporting of paid deferred and unpaid interest post loan

6    modification is willful, intentional and engaged in for the sole purpose of harming and

7    damaging its borrowers for the sole benefit of BANA.

8

9                                            V.

10   **BANA HAS REFUSED ALL REQUESTS TO CORRECT ITS WRONGFUL**

11                                      **POLICIES**

12        66.    Plaintiffs allege that demand has been made individually by both of them

13   to BANA to change its policy and provide correct Forms 1098 to them and that such

14   demands have been refused.   Plaintiffs further allege that plaintiffs' counsel have

15   made demand on BANA to provide correct 1098s to all of its borrowers who have

16   obtained loan modifications and that that demand was also refused in writing by

17   BANA's outside legal counsel.

18

19                                          VI.

20   **THE SPECIFICS OF BANA'S MULTIPLE WRONGFUL ACTS**

21        67.    Plaintiffs allege that after the effective dates of their loan modifications,

22   they, and each member of the class, made monthly mortgage payments to BANA, and

23   that at least some portion of these payments was properly allocable to the repayment

24   of the mortgage interest that existed as part of their pre-modification loan balance.[21]

25   BANA wronged plaintiffs and the members of the class by: (1) failing to report on

26   ─────────────────────
     [21] In fact, plaintiffs allege that because BANA's notes contain "interest before principal"
27   allocation provisions, the entirety of their mortgage payments post-modification is properly
     allocable to repayment of any interest incurred prior to the modification until such time as all
28   of that pre-modification interest has been repaid.

                                           -21-

Forms 1098 the portion of the payments class members made to BANA after their loan modifications that constituted repayment of any mortgage interest that existed prior to the loan modification; and (2) failing to tell class members that a consequence of entering into their loan modification agreements with BANA would be that they would forever lose their ability to deduct the interest that they had accrued prior to their modification agreement.

68. Plaintiffs allege that in or about 2009, BANA unilaterally changed its 1098 reporting practices such that from that tax-year forward, it wrongfully ceased reporting any payments of any kind of deferred or unpaid interest that BANA had "capitalized" on Forms 1098. It is further alleged that this change in policy to not report any such interest was made at the highest levels of BANA. More specifically, attached hereto as Exhibit "F" is a true and correct copy of a letter sent by BANA's Office of BANA's president and CEO to another taxpayer who had complained to BANA about its interest reporting policy which confirms this fact.

69. Plaintiffs allege on information and belief that there are at least two reasons why BANA knowingly and intentionally failed to notify its borrowers (and potentially the IRS) of its wrongful reporting policy. The first reason was to eliminate income to the Bank and/or to create a paper loss. By "converting" the pre-loan modification interest into "principal," BANA could potentially "write off" the interest income it had previously taken (on an accrual basis) while then collecting that same sum later as a repayment of "principal" that would not have to be reported as "income." The second reason is to reduce BANA's accounting costs in tracking the amounts of mortgage interest its borrowers are paying. By simply "wiping the slate clean" of all pre-existing interest, BANA is able to significantly simplify its task of "complying" with 26 U.S.C. § 6050H. But 26 U.S.C. § 6050H does not provide BANA the discretion to choose expediency over compliance. 26 U.S.C. § 6050H rather requires that BANA calculate and *accurately* report the amounts of interest (over $600) that it receives from a borrower in a given year.

# VII.

## PLAINTIFFS AND THE MEMBERS OF THE CLASS REASONABLY RELIED ON BANA TO CALCULATE THEIR INTEREST PAYMENTS AND THIS COURT IS THE PROPER FORUM IN WHICH TO SEEK RELIEF

70.   Plaintiffs allege that reliance on Forms 1098 by borrowers like them and their tax-preparers is the norm and is entirely reasonable since: (1) mortgage lenders like BANA have the legal duty imposed by Congress under 26 U.S.C. § 6050H to calculate and report those amounts accurately; (2) the IRS relies exclusively on the amounts contained in the 1098 forms it receives; and (3) the IRS maintains a policy whereby it will reject any attempt by tax-payers to claim different amounts of interest from those appearing on the tax-payer's Form 1098.

71.   The IRS's policy is evidenced by Exhibits "G" and "H" attached hereto and incorporated herein by this reference.  Exhibit "G" is a redacted IRS letter sent to a tax-payer other than plaintiffs who had a negative amortization mortgage with BANA and who tried to independently calculate and submit to the IRS the correct amount of deferred interest that they had paid.  The IRS rejected the tax-payers' return stating that: "we [the IRS] cannot adjust the amount claimed on schedule A for mortgage interest, without a corrected Form 1098…"

72.   It is alleged that the IRS Office of the Taxpayer Advocate has taken the position that the resolution of Form 1098 reporting disputes between an issuer and the recipient is a "legal matter" that the IRS would not interfere with.  See Exhibit "H" which is a true and correct email exchange between counsel for plaintiffs and the IRS relating to BANA.

73.   It is further alleged that although the Department of Justice received notice under CAFA of the eventual settlement wherein Bank of America, N.A. changed its reporting policy, the IRS chose not to involve itself in that litigation.

///

**CLASS ACTION COMPLAINT**

# VIII.

## THE DAMAGES SUFFERED BY THE PLAINTIFFS AND THE CLASS AND THE NEED FOR INJUNCTIVE RELIEF

74.    BANA's decision not to tell consumers about its wrongful reporting policy in the loan modification agreement (or in any of the writings that were part of the negotiations leading up to the actual agreement) and its failure to issue correct Forms 1098 has, in many cases, had a permanent and detrimental effect on its borrowers.    Specifically, because there is a three-year statute of limitations for amending tax returns imposed by 26 U.S.C. § 6511, borrowers like plaintiffs who modified their loans prior to 2011, and thus who paid back pre-modification deferred interest in those years, can no longer amend their tax returns to undo the effects of BANA's wrongful reporting for those years.

75.    Further, because BANA's violations of 26 U.S.C. § 6050H did not stop in 2010, the harm is continuing.    BANA has compounded its violations each and every year thereafter by only reporting the amount of "current interest" on its borrowers' Forms 1098 and ignoring all of the interest that existed on its borrowers accounts prior to the effective dates of their loan modifications.

76.    As a direct an proximate result of BANA's wrongful conduct, plaintiffs and the class members have suffered damages consisting of, at least: (1) accountancy fees necessary to prepare and file amended tax returns for those years where such returns can still be filed to correct BANA's wrongful reporting, (2) the value of any deductions they lost (both state and federal) for any under-reporting of interest in years where it is too late to file amended returns due to the expiration of the three-year statute of limitations imposed by 26 U.S.C. § 6511.    (All of this relief can properly be awarded on equitable grounds as well.)

77.    Plaintiffs, on behalf of themselves and the members of the class, also seek injunctive and equitable relief from BANA for intentionally and/or negligently under-reporting to them, class members, and to the IRS the "mortgage interest"

payments they made post loan modification.  They also seeks declaratory relief asking the Court to declare that BANA's accounting and reporting practices are wrongful and that BANA be required to issue corrected Form 1098s to plaintiffs, class members, and the IRS for all tax years where BANA wrongfully reported mortgage interest payments.

## IX.

## THE PARTIES

78.    Plaintiffs are individuals who during all times relevant herein resided in the Central Districts of California.  They further had a mortgage loan owned and/or serviced by BANA.  Plaintiffs paid BANA more than $600 in mortgage interest in each of the tax-year since they entered into their loan modification agreements, but did not receive an IRS Form 1098 from BANA reflecting all of the interest they paid because of BANA's wrongful accounting practice previously described.

79.    Class members reside in and are located throughout the United States and in foreign jurisdictions.  Each class member either owns a main home, second home, residential rental home, or combination thereof in the United States, or in one of its possessions or territories with BANA and has received a loan modification from BANA.

80.    BANA is, and at all times mentioned herein was, National Bank with its corporate headquarters located in Charlotte, North Carolina and does business in all 50 states, including California.

## X.

## JURISDICTION AND VENUE

81.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 2201, 2202.  Subject matter jurisdiction also exists under the Class Action Fairness Act of 2005 -- 28 U.S.C. §§ 1332(a) and 1332(d) -- because the matter in controversy

exceeds $5.0 million exclusive of interest and costs and the named plaintiff are citizen of California and BANA is not.  Further, class members reside, on information and belief, in every state in America.  There is therefore minimal diversity between the class members and the defendant.  Further, more than two-thirds of the members of the putative class members are citizens of states different from that of the defendant and this case does not present a local controversy.

82.    This Court has personal jurisdiction over BANA because, among other things, BANA does business in the State of California and in this Judicial District, and because BANA has established minimum contacts with California such that the exercise of jurisdiction over it will not offend traditional notions of fair play and substantial justice.  Indeed, BANA has voluntarily conducted business and solicited customers in the State of California for its loans, including in this Judicial District and continues to commit the wrongful acts alleged herein against California residents within this Judicial District.

83.    Venue is proper in this Judicial District under 18 U.S.C. §1391 and 1965. BANA can be found in, has one or more agents in, and/or transacts or has transacted business in this judicial district. Finally, the loan transactions involving the Plaintiffs and BANA occurred in this Judicial District.

## XI.

## CLASS ALLEGATIONS

84.    Plaintiffs bring this action on their own behalf and on behalf of classes of persons similarly situated pursuant to Rule 23(a) and 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

85.    Plaintiffs seek to represent a damage class of:

"all persons who: (1) had a BANA mortgage secured by real property in the United States (or in its territories and protectorates); (2) had their loan modified; (3) owed previously

**CLASS ACTION COMPLAINT**

deferred or unpaid interest that was not forgiven as part of the modification; (4) made monthly mortgage payments to BANA after receiving their loan modification; and (4) made those payments in a year for which, because of the passage of the statute of limitations for amending tax returns, it is too late for the person to amend their tax returns to correctly state amount of mortgage interest they paid during that year."[22]

86.   Plaintiffs also seek to represent an injunctive class of:

"all persons who: (1) had a BANA mortgage secured by real property in the United States (or in its territories and protectorates); (2) had their loan modified; (3) owed previously deferred or unpaid interest that was not forgiven as part of the modification; (4) made monthly mortgage payments to BANA after receiving their loan modification; and who (5) made those payments in a year for which they can still amend their tax returns to state the correct amount of mortgage interest they paid during that year."[23]

87.   Plaintiffs further assert that if for any reason that a national class is not certified, a California-only class should be certified consisting of all members of the above classes whose properties securing their mortgages are located in California. Plaintiffs further reserve the right to amend the definition of these classes, or to amend their complaint to state appropriate sub-classes following discovery. Plaintiffs do not know the exact size of the classes or the identities of the class members since such

---

[22] This class definition assumes that BANA will be ordered to issue corrected Forms 1098 in the correct amounts for all of the years for which it is not too late to file amended returns. To the extent that corrected Forms 1098 are not issued, the damage class would include all persons who meet the first three prongs of the above definition.

[23] This definition again assumes that the Court will order BANA to issue corrected Forms 1098s for the years for which the class members can still file amended returns with the IRS.

information is in the exclusive control of BANA.  They believe, however, that the class (and the California subclass) encompasses at least tens of thousands of individuals who are geographically dispersed throughout the United States and in foreign nations.  The number of members in the classes are so numerous that joinder of all class members is impracticable.

88.    There are numerous questions of law and fact common to the classes that will predominate over any questions affecting only individuals.    Among these common questions are:

a.    Whether any portion of the deferred or unpaid interest that was not specifically forgiven by BANA continues to be "mortgage interest" after it has been capitalized by way of a loan modification?

b.    If such amounts continue to be mortgage interest post-modification, does BANA have the obligation to report repayments of that interest on Forms 1098?

c.    How borrowers' payments should be allocated, i.e. between interest and principal.

d.    Whether in some years BANA under-reported class members' mortgage interest on Form 1098?

e.    Whether BANA had the right to unilaterally "convert" borrowers' deferred or unpaid mortgage interest into "principal" as part of the loan modification process without telling them that they would forever lose their right to deduct that interest when they paid off those amounts and/or whether such was an unfair business practice?

f.    Whether BANA maintains written and/or unwritten policies, procedures and/or practices concerning the accounting and reporting of mortgage interest payments received by BANA from class members, and whether those policies have changed over time?

g.    Whether BANA had a duty to disclose to its borrowers that (due to BANA's 1098 reporting policies) a consequence of their entering into the loan

modification agreement would be that they would lose their ability to deduct the deferred and unpaid interest that they would continue to owe after the modification?

h.     If BANA had had a duty to disclose to its borrowers prior to their entering into the loan modification, that they would forever lose their ability to deduct the deferred and unpaid interest that they would continue to owe after the modification, what the consequences should be from that non-disclosure, including, inter alia, whether BANA should be equitably estopped from asserting any affirmative defenses that might otherwise be available to it?

i.     Whether BANA acted intentionally in committing its wrongs against the class members?

j.     What injunctive relief would be appropriate to prevent further wrongful conduct by BANA?

k.     What remedial measures would be appropriate to remedy the wrongs that have been done by BANA to the members of the class? and

l.     Whether punitive damages should be awarded against BANA?

89.     The claims of the Plaintiffs are typical of the claims of the classes and do not conflict with the interests of any class members in that both the Plaintiffs and the class members were subjected to the same wrongful policies, practices and procedures of BANA and all have an interest (and legal duty) to assure that their taxes are properly stated.

90.     The Plaintiffs will fairly and adequately represent the interests of the other class members.  The plaintiffs have retained skilled and experienced counsel to represent the class in this class action litigation.

91.     Prosecution of separate actions by individual class members will create the risk of adjudications with respect to individual class members which would, as a practical matter, be dispositive of the interests of class members who are not parties to those adjudications and would/could substantially impair or impede their ability to protect their interests.

92.     In adopting and implementing the policies, practices and procedures herein-alleged, BANA has acted, failed, or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or declaratory relief with respect to the class as a whole.

93.     The class action is superior to other available methods for fairly and efficiently adjudicating the issues concerning whether BANA's policies, practices and procedures in accounting for and reporting the payment of deferred and unpaid mortgage interest received by BANA have class-wide impact and effect.

## COUNT I
## BREACH OF CONTRACT

94.     Plaintiffs re-allege and hereby incorporate each and every allegation contained in Paragraphs 1 through 93 of this Complaint as though fully set forth herein.

95.     With the origination of each of the class members' loans, BANA, or its predecessor in interest, provided class members with promissory notes which serve as the contract between the class members and BANA.   The loan modification agreements entered into between BANA and the members of the class become a part of the original contract

96.     Although these notes do not contain any provision specifically governing the manner in which BANA would report mortgage interest to plaintiffs and class members, it is an implicit term of each such contract that BANA will abide by its legal duty to provide accurate Forms 1098 as required by 26 U.S.C. § 6050H.  This implicit term of the BANA notes is material to borrowers because of the tax deductibility of mortgage interest and so they can carry out their legal obligation to file their taxes accurately.

97.     BANA has continually breached this implied contractual term by failing to accurately report interest payments "received" by it as required by § 6050H and the definition of interest under 26 U.S.C. § 163(a).

98.     Although Plaintiffs were in default on their loans at the time they entered their loan modifications, they have been current with their payments post-modification.  In any event, their defaults did not excuse BANA from its independent duty to accurately report their payments of mortgage interest.  Moreover, BANA waived any non-performance by plaintiffs by agreeing to their loan modifications.

99.     As a result of BANA's breach of the implicit term of its notes, plaintiffs and the class members have been damaged as set forth above.

## COUNT II
## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

100.    Plaintiffs re-allege and hereby incorporate each and every allegation contained in Paragraphs 1 through 99 of this Complaint as though fully set forth herein.

101.    In every contract, parties have a duty to act in good faith and deal with each other fairly.  At the time of entering into the loan modification agreements with plaintiffs and the members of the class, BANA was already in a contractual relationship with the plaintiffs and the members of the class consisting of the original loan agreements.  As such, BANA had such a duty to act in good faith with respect to plaintiffs and the class members.  This included the duty to not to conceal and/or fully and unambiguously disclose to plaintiffs and class members that a consequence of agreeing to BANA's loan modification agreement would be that BANA would "convert" of all of their deferred and/or unpaid interest into "principal," and that as a result they would forever lose the opportunity to deduct that interest when it was paid.

102.    BANA breached the implied covenant of good faith and fair dealing by failing to report to the IRS payments of deferred and unpaid interest it received from

Plaintiffs and class members consistent with IRS regulations and guidelines. This inaccurate reporting caused class members to receive inaccurate Form 1098s thereby depriving them of significant tax deductions.

103. As a result of BANA's breaches of the implied covenant of good faith and fair dealing, plaintiffs and the class members have been damaged as set forth above.

104. It is further alleged that BANA acted intentionally and with knowledge that its reporting policies were in violation of law and took its actions notwithstanding that knowledge so as to maximize its own profits and avoid conflict with its borrowers and the IRS.

105. BANA committed its wrongful acts intentionally and with knowledge of the harm it was doing to consumers and in a manner shocking to the conscience so punitive damages should be assessed against BANA.

## COUNT III

## UNFAIR/DECEPTIVE BUSINESS PRACTICES

106. Plaintiffs re-allege and hereby incorporate each and every allegation contained in Paragraphs 1 through 105 of this Complaint as though fully set forth herein.

107. California Business & Professions Code § 17200 et seq. ("UCL") prohibits acts of unfair competition, including any "unlawful, unfair or fraudulent business act or practice."

108. As alleged above, BANA has been violating the terms of 26 U.S.C. § 6050H by failing to include payments of mortgage interest that were actually made by Plaintiffs and class members and also in failing to disclose to them that a consequence of entering into their loan modification agreements would be that they would forever lose their ability to deduct their accrued mortgage interest when they did repay those funds. BANA's practices constitute an unlawful, unfair and

1  fraudulent business practices under the UCL and would also constitute violations of

2  similar consumer protection laws in applicable in the several United states.

3      109.   However, in the event that the Court determines that the UCL either

4  cannot be applied in these circumstances outside of California, or that the differences

5  between the laws of the several states and California's UCL as so substantial as to

6  make the administration of a class action unmanageable, then Plaintiffs assert that a

7  separate subclass of California borrowers should be certified for at least Plaintiffs'

8  UCL claim and any others for which it is appropriate.  This class would be defined in

9  the same manner as the main class, but would be limited to class members with loans

10  secured by real property located in California.

11      110.   Plaintiffs have suffered losses of money or property as a result of

12  defendants' unlawful, deceptive and unfair business practices and will incur future

13  losses as a result of having to amend their tax returns.   As a result of defendants'

14  violations of the UCL, plaintiffs and class members are entitled to bring this claim for

15  injunctive and other equitable relief.   The specific equitable relief they request is

16  stated in their prayer (below).

17

18                              **COUNT IV**

19                         **DECLARATORY RELIEF**

20      111.   Plaintiffs re-allege and hereby incorporate each and every allegation

21  contained in Paragraphs 1 through 111 of this Complaint as though fully set forth

22  herein.

23      112.   An actual controversy has arisen and now exists between plaintiffs and

24  BANA regarding the manner in which BANA accounts for payments of deferred and

25  unpaid interest that existed on its borrowers' accounts as of the time they had their

26  loans modified as alleged above.

27      113.   Plaintiffs and the class members contend that BANA has maintained

28  policies whereby it wrongfully concealed from class members that as part of their loan

-33-

1   modification, BANA would eliminate the deferred and unpaid interest on their

2   accounts.    Plaintiffs further allege that BANA did this for its own advantage.

3   Plaintiffs have demanded that BANA issue them correct Form 1098s and BANA has

4   refused.

5       114.   A declaratory judgment is necessary to immediately resolve the issue as

6   to whether BANA is correctly reporting class members' mortgage interest payments

7   on Form 1098s and whether BANA should be required to provide corrected 1098

8   forms to the class members for all years in which its policies did not conform to law.

9       115.   Without such a declaratory judgment, plaintiffs and the class members

10   will have no way of properly reporting their payments of mortgage interest to the IRS

11   in their tax returns and cannot correct previous errors caused by BANA.

12       116.   Wherefore, declaratory relief is necessary and proper in this matter.

13

14   **COUNT V**

15   **FRAUD**

16       117.   Plaintiffs re-allege and hereby incorporate each and every allegation

17   contained in Paragraphs 1 through 116 of this Complaint as though fully set forth

18   herein.

19       118.   As detailed as BANA is in all its forms, disclosures and communications

20   to its borrowers regarding the benefits of a loan modification, not once does BANA

21   disclose to its current borrowers that if they obtain a loan modification from BANA,

22   they will lose thousands, if not tens of thousands, of dollars as a result of BANA's

23   capitalization of the unpaid interest that has been incorporated into the "New Principal

24   Balance" of the modified loan.

25       119.   As alleged previously, BANA knowingly and intentionally concealed

26   from plaintiffs and the other class members that a consequence of proceeding with

27   their loan modifications would be that BANA would "convert" all deferred and unpaid

28   interest into "principal" and that BANA would not report that interest on the

-34-

borrower's Form 1098 when it was repaid. BANA intentionally concealed its policy from its borrowers for its own benefit as alleged previously. The information BANA concealed was material to plaintiffs in that had they known the true facts, they would have acted differently than they did.

120. Plaintiffs allege that other lenders properly report deferred interest that has been incorporated into a modified loan balance, and that BANA did not make the disclosures to Plaintiffs and class members because if its practice was disclosed, Plaintiffs and class members may not have refinanced their homes leaving BANA with distressed properties to sell in a declining market, or alternatively borrowers may have sought other lenders to refinance their properties, in which case, all of their deferred and unpaid interest would have been paid off and reported on Form 1098, or short-sold their homes, in which case, depending on the sale price, any interest of the deferred interest that was paid back would have been reported by BANA on Form 1098.

121. BANA was under a legal duty pursuant to 26 U.S.C. §6050H to report accurately  all the interest BANA "received" during each calendar year and it was further under a duty to correct any mistakes on Forms 1098 as soon as possible after determining that a wrong amount had been reported.

122. BANA knew that its concealment of the facts relating to its wrongful interest reporting would be relied upon by plaintiffs and the class members (and the IRS).

123. Plaintiffs and the class members did not know about BANA's improper and illegal reporting, and, even if some tiny percentage may have figured it out, they were still powerless to avoid being damaged by BANA's fraud because of the IRS' policy of rejecting any returns where the amount of interest claimed did not match the amount of the lender-issued Form 1098.

124. BANA knew that plaintiffs and the class members' reliance on the incorrect Forms 1098 would cause detriment to the plaintiffs and the class members

both in terms of the (1) inability (due to the passage of time) to correct BANA's over-reporting of interest in years prior to 2011, and (2) in the failure to take deductions for the interest that plaintiffs and class members paid in 2011 and later years that BANA unilaterally decided not to report in violation of 26 U.S.C. § 6050H.

125.   As a direct and proximate result of BANA's multiple concealments, Plaintiffs and the class members have been damaged in an amount according to proof.

126.   BANA's fraudulent concealment was undertaken with a conscious disregard of its effect on plaintiffs and the class members and in a manner shocking to the conscience such that punitive damages should be awarded.

## COUNT VI
## VIOLATION OF 26 U.S.C. 6050H

127.   Plaintiffs re-allege and hereby incorporate each and every allegation contained in Paragraphs 1 through 126 of this Complaint as though fully set forth herein.

128.   Plaintiffs assert that there  exists an implied private right of action to enforce the terms of 26 U.S.C. § 6050H under the test established in *Cort v. Ash*, 422 U.S. 66, 78 (1975).

129.   To the extent an implied private right of exists on behalf of a borrower to enforce the terms of 26 U.S.C. § 6050H against a lender, Plaintiffs allege as follows:

130.   BANA had a duty to accurately report to the IRS the amount of mortgage interest Plaintiffs and class members paid to it under 26 U.S.C. § 6050H.  BANA breached this duty by failing to report payments of deferred interest on the Form 1098s it issued to its borrowers, including plaintiffs and the class members.

131.   As a proximate result of BANA's breach of its statutory duty as herein alleged, plaintiffs and class members have been harmed and deprived of the ability to

1   accurately report to the IRS the full amount of their mortgage interest deduction and

2   are entitled to equitable relief to remedy their situation.

3       132.   As a further direct and proximate breach of this duty by BANA, Plaintiffs

4   and class members have been damaged as set forth above.

6   ## **PRAYER FOR RELIEF**

7       WHEREFORE, plaintiffs on behalf of themselves and all class members, pray

8   for judgment and injunctive and equitable relief against BANA as follows:

9       (a)   Certification of the classes pursuant to Rule 23(b)(2) and (b)(3) of the

10          Federal Rules of Civil Procedure, certifying Plaintiffs as the

11          representatives of the classes (and for the California sub-class (if

12          necessary)), and designating plaintiffs' counsel as counsel for the class

13          (and subclass if necessary);

14      (b)   A judicial declaration that BANA has committed the violations alleged

15          herein;

16      (c)   For general and special damages in an amount to be proven at time of

17          trial, including, but not limited to, accountancy fees necessary to amend

18          their tax returns and/or to determine the value of any lost deductions, and

19          the value of the lost deductions;

20      (e)   For punitive or exemplary damages on all causes of action where

21          appropriate;

22      (f)   For an order enjoining BANA from issuing any IRS Form 1098s that do

23          not account for its receipt of unpaid or deferred interest received from

24          and that BANA be compelled to issue corrected 1098 forms to all class

25          members for all years in which it has done so wrongfully and for which

26          there is still sufficient time for class members to amend their tax returns

27          for that year.   Plaintiffs further request that as part of its equitable

28          powers, the Court order BANA to pay for the accounting fees necessary

for all class members to amend their tax returns should they wish to do so to correct BANA's error.

(g) An order in equity (if no damages are awarded) requiring BANA to pay any accountancy expenses necessary to determining if they lost money as a result of BANA's mis-reporting of mortgage interest on their Forms 1098;

(h) Prejudgment interest at the legal rate;

(j) Attorney's fees according to proof at time of trial;

(k) Costs of suit, including expert witness fees and costs, herein incurred;

(l) For such other and further relief as this Court may deem proper and just;

## JURY TRIAL DEMAND

Plaintiffs and all those similarly situated hereby demand a trial by jury for all issues so triable, including all of Plaintiffs' claims and any affirmative defenses that may be asserted herein.

Date: August 25, 2014

MORRIS POLICH & PURDY LLP

By: _____

David J. Vendler

Attorneys for Plaintiffs Lora Smith, Cynthia Himple, and all others similarly situated

-38-