1 | LAW OFFICE OF DAVID J. VENDLER
David J. Vendler, Esq. (SBN 146528)
2 | 2700 South Oak Knoll
San Marino, California 91108
3 | Tel.:   (213) 700-5194
Email:      djvlegal@gmail.com
4 |
MICHAEL R. BROWN, APC
5 | Michael R. Brown, Esq. (SBN 65324)
2030 Main Street Suite 550
6 | Irvine, California 92614
Tel.:   (949) 435-3888
7 | Fax:   (949) 435 3801
Email:      mbrown@mrbapclaw.com
8 |

9 | Attorneys for Plaintiffs, Cynthia Himple,

10 | Lora Smith, and all others similarly situated

11 |

12 | UNITED STATES DISTRICT COURT

13 | CENTRAL DISTRICT OF CALIFORNIA

14 | CENTRAL DIVISION

15 |

16 | CYNTHIA HIMPLE and LORA
SMITH, individually, and on behalf of
17 | the class of all others similarly situated,
18 |
19 | Plaintiffs,
20 | vs.
21 |
BANK OF AMERICA, N.A., a national
22 | banking association,
23 | Defendant.
24 |
25 |
26 |
27 |
28 |

Case No.: 2:14-cv-06668-DSF-PLA

**THIRD AMENDED CLASS
ACTION COMPLAINT FOR:**

1. **BREACH OF CONTRACT**
2. **BREACH OF THE COVENANT
OF GOOD FAITH AND FAIR
DEALING**
3. **VIOLATION OF UNFAIR
COMPETITION LAW**
4. **DECLARATORY RELIEF**
5. **FRAUD**
6. **NEGLIGENCE**

**DEMAND FOR JURY TRIAL**

-1-

THIRD AMENDED CLASS ACTION COMPLAINT

NOW COME Plaintiffs Cynthia Himple and Lora Smith ("Plaintiffs"), on behalf of themselves and all others similarly situated (collectively "Class members"), and complain as follows against defendant Bank of America, N.A. a national banking association, ("BANA" or "defendant").

# I.

## SUMMARY OF THE ACTION

1.     For almost all owners of real property, the mortgage interest deduction is their largest single tax deduction and can amount to hundreds, thousands, or even tens of thousands of dollars per year in tax savings.  Tax-payer-borrowers, the Internal Revenue Service ("IRS"), and accounting professionals all rely on lender-issued IRS Forms 1098 to determine the amount of mortgage interest the tax-payer-borrower(s) paid during a given year so as to know how much can be deducted from gross income pursuant to 26 U.S.C. § 163(a).  The statute that requires lenders to issue Forms 1098 is 26 U.S.C. § 6050H.   It states in very simple terms that lenders must report on Forms 1098 the amount of mortgage interest they "receive" during a given calendar year, if that amount is over $600.[1]

2.     Without any exaggeration, for at least the past seven years BANA has been secretly, willfully, systematically and knowingly under-reporting on Forms 1098 hundreds of millions, if not billions, of dollars in mortgage interest that it has *actually received* from borrowers to whom it granted "loan modifications."  It is alleged on information and belief that regardless of the damage that its policy is doing to its borrowers, it is doing so to maximize its own profits by reclassifying and hiding its own income. It is also doing it because it makes its internal accounting simpler and less expensive. However, it is doing this without notice to its borrowers and in violation of its contractual and statutory duties.

3.     Following the financial crisis of 2008, many of BANA's borrowers fell into financial distress and thus were having difficulty keeping current with their

---

[1] Reporting is optional if the amount is less than $600.

mortgage obligations.  One alternative to foreclosure and/or potential bankruptcy was for them to seek a loan modification from BANA.

4.       Loan modifications are not refinances.  No additional money is advanced to the borrower and the original note is not paid off or cancelled.  Rather, as the name suggests, loan modifications are accomplished through a written amendment changing only certain terms of the original note, with the balance of the terms remaining unchanged and the same deed of trust continuing to secure the note.  The same loan number continues to be used by BANA post-modification for the very reason that the loan is just being modified and not replaced.  Further, BANA's loan modification agreements all contain the following language or its functional equivalent: "nothing in this agreement (sic)[2] shall be understood or construed to be a satisfaction or release in whole or in part of the Note or Security Instrument.  Except as otherwise specifically provided for in the Agreement, the Note and Security Instrument will remain unchanged."

5.       The deeds of trust that accompany the loan notes also all contain language recognizing that loan modifications are just that, modifications of existing debt, and not new extensions of credit.  Specifically, they all contain the following language or its functional equivalent: "Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower."  In short, loan modifications are not "new loans."[3]

---

[2] As a specifically defined term in BANA's drafted document, the word "agreement" should have been capitalized.

[3] Case law is uniform that loan modification agreements are not new extensions of credit, but are, just as the title implies, modifications to the terms of an existing loan. See, generally, *Central Bank of Kansas City v. Perry*, 427 S.W.3d 285 (Mo.App. W.D. 2014) (loan modification is not a new loan); *In re Hart*, 246 B.R. 709, 738 (Bankr.D.Mass.2000) (same); *Diamond v. One West Bank*, 2010 WL 1742536 (D.Ariz. 2010) ("A loan modification does not require additional TILA disclosures,

-3-

6.      Among the most significant terms that are frequently modified from the original notes are: (1) the interest rate to be charged; (2) the length/term of the loan; (3) that any outstanding/unpaid interest that is part of the borrower's loan balance at the time the loan modification takes effect will be "capitalized," meaning that interest will be charged on both the previously unpaid principal and previously unpaid interest;[4] and (4) where the original note was an Option Arm note that provided the borrower with several choices of how much to pay in a given month, including paying less than the interest owed – resulting in negative amortization – those options were eliminated.

7.      At the time borrowers applied for their loan modifications, the borrower's total debt obligation to BANA invariably includes both unpaid principal and unpaid interest.[5]  This is because borrowers seeking loan modifications are often many months behind on their payments, or had Option Arm loans that allowed them to defer interest payments.  Thus, at the time their loan modifications become effective, their debt to BANA includes thousands, or even tens of thousands, of dollars of accrued but unpaid interest.  Because this accrued but unpaid interest was charged to the borrower for the borrower's use of the original principal, it is "mortgage interest" (and should have been

_____

particularly where no new monies are advanced."); *Sheppard v. GMAC Mortg. Corp.*, 299 B.R. 753, 760–63 (Bankr.E.D.Pa.2003) (same); *Castrillo v. Am. Home Mortg. Servicing, Inc.*, 670 F.Supp.2d 516, 528 (E.D.La.2009) (same.); *Washington v. Natl. City Mortg., Co.*, 2011 WL 1842836 (N.D. Cal. 2011) (same); and *Green v. CitiMortgage, Inc.*, 2011 WL 5866230 (W.D.Vir. 2010)(same).

[4] Capitalization of interest does not operate to change its character from interest to principal. As stated in *Motel Corporation v. Commissioner of Internal Revenue*, 54 T.C. 1433 (1970) "we can perceive no reason why defaulted . . . [or deferred] . . . interest should be transformed into principal for purposes of tax law.  Such interest, no matter when paid, is clearly compensation for the use of money, and its character as such does not change merely because it is not timely paid."

[5] Often the interest owed will be comprised both of past due interest as well as current interest, i.e. interest that has accrued, but where that month's payment date has not yet arrived. However, even if a borrower was current prior to the modification, by the time the modification takes effect, interest will be owed because BANA required borrower not pay three payments and go into default in order to qualify for a modification.

**THIRD AMENDED CLASS ACTION COMPLAINT**

reported by BANA on Form 1098 in the year it is paid pursuant to 26 U.S.C. Section 6050H).[6]

8.     But like the alchemist trying to turn lead into gold, BANA is using an accounting sleight of hand to "convert" its borrowers' accrued interest into "principal," and then, effectively, wiping the borrower's accrued interest off its books for Form 1098 reporting purposes.  But, under bedrock tax law, interest charged on a loan simply cannot be transformed into "principal" no matter what esoteric accounting device is used.[7]

9.     Adding to the wrongfulness of BANA's conduct is that BANA implemented its "interest elimination" policy with absolutely no notice to its borrowers. Borrowers were never informed that the actual Form 1098s they would receive after the loan modification, would not include all interest paid to BANA by the borrower. Although borrowers, their accountants and the IRS rely on the dollar amount of interest BANA reports on Form 1098 to determine the amount of interest paid, and the appropriate amount of interest to deduct on the taxpayer's Form 1040, borrowers were never told that after the loan modification, and a long history of relying on Forms 1098, they could no longer rely on the amount reported on Forms 1098 and had to individually, for each year, try to calculate the actual and true interest the borrower had paid.

---

[6] See *Smoker v. C.I.R.*, 2013 WL 645265 (Tax Ct. 2013) which squarely holds that deferred interest does not lose its character as mortgage interest simply because it is added to principal.  "Whether interest is charged by way of an original issue discount (OID) (i.e., interest withheld from the loan proceeds) or as capitalized interest (i.e., periodic interest added to the loan's principal), the economic reality is the same: the borrower is able to postpone paying the interest due to sometime in the future, either over the life of the loan or as part of a balloon payment upon maturity." *Id*. at *4. See also Copeland v. CIR, 2014 WL 5483046 (Tax Court 2014)

[7] *Old Colony R. Co. v. Commissioner of Internal Revenue*, 284 U.S. 552, 561 (1932) ("[W]e think that, in the common understanding, 'interest' means what is usually called interest by those who pay and those who receive the amount so denominated in bond and coupon, and that the words of the statute permit the deduction of that sum, and do not refer to some esoteric concept derived from subtle and theoretic analysis.")

-5-

10.     An example best makes the point of what BANA is doing wrong.  Assume that John Doe has had a mortgage with BANA for 10 years and has received Forms 1098 each year, and has used that form to take his tax deduction on his tax returns.  As of January 1, 2012, his mortgage loan balance is $600,000. His annual interest rate is 10% per *anum*, or $5,000 per month.  He has an Option Arm Loan and only makes current interest payments of $5,000.  So each month he satisfies the interest obligation, but there is no reduction in the principal.

11.     During 2013, Mr. Doe experiences financial difficulty, falls behind on 4 months of payments ($20,000 worth of interest), and requests a loan modification from BANA.  Because of the processing time between Mr. Doe's application and the grant of his loan modification, another 8 months pass without any further payment by Mr. Doe ($40,000 in interest).  His loan modification is approved with new payments to begin January 1, 2014. Thus, as of January 1, 2014, the effective date of Mr. Doe's loan modification, his loan balance consists of $600,000 in original principal and $60,000 in unpaid interest.[8]

12.     Under the terms of the modified loan, Mr. Doe is provided a reduced interest rate of 3% per year.  However, per the loan modification agreement, interest will not only be charged on the original $600,000 principal, but also on the $60,000 in previously deferred interest.[9]  Further, the loan modification agreement provides that

---

[8] Herein lies the problem with BANA's language.  Most loans begin with an amount borrowed and that is normally referred to as the "Principal". For regular borrowers, monthly payments consist of two parts: current interest and an amount that reduces the "Unpaid Principal Balance".  All money paid towards interest is deductible and reported on Forms 1098.  However, once unpaid interest is added to the amount that was actually borrowed, the "loan balance" is no longer a pure amount of unpaid principal.  It is a combination of unpaid principal which is not deductible and unpaid interest which is deductible when paid.  However, BANA refers to the combined components as the "principal balance". When BANA receives a single payment and reduces the "principal balance" it must separate the payment into the two components and report what portion is payment of deferred or previously unpaid interest.

[9] This is called capitalization of interest.

**THIRD AMENDED CLASS ACTION COMPLAINT**

the loan will be amortized to be repaid in full (principal and interest) over a new 30-year period beginning on the date the modification becomes effective. The new payment amount is $2,000.  This means that Mr. Doe's new monthly payment includes two components; (1) $1,650[10] in interest for the month in which the payment is made ("current interest") and (2) an additional sum sufficient to result in the repayment of the modified loan balance amortized over the new 30-year term.  For the purposes of this example, assume that that this amount averages $350 per month for all of 2014.  Thus, Mr. Doe's **total annual** payments to BANA, for paying off the entire loan principal and current interest over the new 30 year amortized period, is $2,000 per month or $24,000 per year.  Therefore, the total of payments for the first year, 2014, is $24,000.

13.     Mr. Doe gets a Form 1098 for 2014 as he has gotten every year before. Under BANA's current (wrongful) Form 1098 reporting policy, BANA reports only Mr. Doe's payment of current interest on Mr. Doe's 2014 Form 1098 [$19,800] ($1,650 x 12 months).  As to the additional $4,200 ($350 x 12 months) Mr. Doe paid in 2014 toward reducing the **$660,000** post-modification **loan balance**, BANA counts this entire amount as a repayment of "principal" and does not report any of it on Form 1098. While certainly simple and straightforward, this does not make BANA's calculation correct.

14.     The reason that BANA's policy is wrong is that it conveniently "forgets", and fails to take into account, that $60,000 of Mr. Doe's $660,000 post-modification loan balance **is itself interest**, i.e. money that BANA charged Mr. Doe for the use of BANA's original principal.  Indeed, BANA's standard loan modification agreement expressly recognizes this fact when it states: "The amount payable under the Note or Security Instrument (the "Unpaid Principal Balance") is $__, consisting of the amount(s) loaned to Borrower by Lender, **which may include**, but are not limited to

---

[10] 3% of $60,000 divided by 12 months = $1,650 per month.

**THIRD AMENDED CLASS ACTION COMPLAINT**

any past due principal payments, **interest**, fees, and/or costs capitalized to date."[11]

15.     The crux of this lawsuit is that to the extent Mr. Doe repays BANA **any** of the past due capitalized interest, BANA is required by 26 U.S.C. § 6050H to calculate and report that payment on Mr. Doe's Form 1098.

16.     Plaintiffs' contention is that because the payment allocation provisions in BANA's notes require payments to be allocated first to repayment of outstanding interest and only then to principal, the entirety of Mr. Doe's post-modification payments to BANA must be applied a) first to the repayment of current interest, 2) then past due interest before being applied to 3) principal. [12] In the example above, this means that BANA should have issued Mr. Doe a Form 1098 in the amount of $24,000 and that it should continue to apply all of his payments to repayment of interest until his $60,000 in past due interest has been fully paid. [13]

17.     BANA's standard loan agreements contain the following language, or its functional equivalent.  "Each monthly payment will be applied as of its scheduled due date, and if the payment includes both Principal[14] and interest, it will be applied to interest before Principal."

18.     BANA's standard deed of trust agreements similarly state the following, or its substantial equivalent: "Except as otherwise described…, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest

[11] Notably, the reference to ("Unpaid Principal Balance") in the loan modification agreement is not a substantive term.  It is just a shorthand reference to "the amount payable under the Note or Security Instrument," which the modification agreement expressly states includes interest.  The mere use of the word "Principal" in this shorthand reference does not, and cannot, under well-established tax law, convert the interest existing at the time of the modification into something other than interest.
[12] Since there is nothing in BANA's standard loan modification agreement that modifies this term, it still controls.
[13] This is consistent with the general rule that partial payments in satisfaction of a debt are first applied toward the reduction of interest, and only then toward repayment of principal.  See *Estate of Paul M. Bowen v. Commissioner*, 2 T.C. 1 (1943).
[14] The term "Principal" is defined to include the amount originally loaned to the borrower.

due under the Note; (b) principal due under the Note; (c) [escrow items such as mortgage insurance]."

19.    In the example above, there is no dispute that the $19,800 Mr. Doe paid in current interest must be included on Mr. Doe's Form 1098.  But, in addition to that money, Plaintiffs contend that the $4,200 Mr. Doe paid in 2014 toward repaying his $660,000 modified loan balance must also be included in the Form 1098 issued by BANA – resulting in a total of $24,000 in reportable interest, as opposed to the $19,800 that would be reported under BANA's current policy.

20.    Indeed, since payments must be allocated to the repayment of interest before principal, the entirety of Mr. Doe's payments in the years after 2014 must also be reported on Mr. Doe's Form 1098 until such time as Mr. Doe has paid sufficient funds to retire the entire $60,000 interest component of his modified loan balance. Accordingly, his monthly payment now represents current interest and a payment towards retiring his original borrowed amount of $600,000.[15]

21.    BANA's method is wrong and as Mr. Doe, his accountant and the IRS reasonably rely on the Form 1098 issued by BANA, and use the number BANA puts on the form,  $60,000 in tax deductions, and the monetary value of those deductions Mr. Doe is legally entitled to claim will disappear.  And Mr. Doe will lose the tax deduction's monetary value of the $60,000 interest he paid to BANA.

---

[15] This is consistent with well-established tax law.  In the student loan context, where interest payments are also regularly deferred, the IRS instructs that all interest payments, including payments of capitalized interest must be reported.  See Instructions for Forms 1098-E and 1098-T -- Student Loan Interest Statement and Tuition Statement and IRS Publication 970.  There is simply no basis to distinguish how lenders should report on Forms 1098 repayments of previously deferred capitalized interest in the home mortgage context under 26 U.S.C. § 6050H and repayments of previously deferred capitalized interest in the student loan context under 26 U.S.C. 6050H.  In both contexts, the money being repaid is money that was charged for the use of money and is therefore deductible interest.  See also Rev. Rul. 70-647, 1970-2 C.B. 38.

THIRD AMENDED CLASS ACTION COMPLAINT

22.    On information and belief, BANA knows that its policy is wrong, but implemented it anyway to accomplish its goals of both hiding its own income by converting interest (which is income to BANA) into principal (which is not income to BANA) and to simplify its Form 1098 reporting calculations to reduce costs.

23.    Further, BANA has actively concealed its wrongful reporting policy from its borrowers.  And, because there is a three-year statute of limitations for amending tax returns under 26 U.S.C. § 6511, BANA's intentional concealment of its improper and illegal reporting practices has not only caused tens of thousands of tax-payers to unknowingly file erroneous tax returns which will have to be unwound at substantial cost, but has also potentially caused Class members the damage of *permanently* losing valuable tax deductions that they can now only recover from BANA.

## II.

## THE 2008 FINANCIAL CRISIS RESULTS IN VAST NUMBERS OF LOAN MODIFICATIONS

24.    In or about 2002-2007 traditional underwriting guidelines for obtaining home loans were relaxed substantially and there was a general push in the lending industry to "close loans."  Long-term risk was subjugated to immediate gain.  New kinds of loan products were marketed by the lending industry to the sub-prime market, such as "Option Arm" loans and loans with artificially low "teaser rates" that allowed potential borrowers to lower their monthly payments in the short term, and thus "afford" a house they otherwise could not.  The pressure to sell these loans ultimately resulted in a great number of risky loans being made to persons who would not have qualified in prior years using traditional underwriting guidelines.

25.    Many of these sub-prime loans were then sold by their initial issuers and packaged into investment vehicles known as Residential Mortgage-Backed Securities ("RMBS").  In these investment vehicles, a special purpose entity would be set up to own the packaged mortgages.  Shares of the entity (or a grouping of similar entities) that owned the RMBS were then sold to investors.

26.     At the center of this brewing storm was Countrywide Financial Corporation.  In 2006, for example, Countrywide financed approximately 20% of all mortgages in the United States.  Many of these were sub-prime loans.

27.     In 2008, the freewheeling mortgage underwriting of earlier years came to a head with unprecedented numbers of defaulting loans.  This in turn led to the collapse of Countrywide and the near collapse of several investment banks that had acquired large portfolios of RMBS.  These failures and near failures catapulted America into a financial crisis.

28.     In July of 2008, just as the financial crisis was beginning to unfold, BANA acquired Countrywide which, at the time, was on its way to failure.

29.     BANA is one of the nation's leading federal savings banks.  As part of its business, it has originated (or acquired from Countrywide and other lenders) hundreds of thousands, if not millions of mortgage loans, both in California and nationally.  While the specific repayment terms may vary, each of these loans provides that the borrower will, in some form or another, pay interest over the course of the loan in exchange for the borrower's use of the borrowed funds.

30.     As the financial crisis worsened over the course of 2008 and 2009, the broader American economy also faltered.  Many consumers lost their jobs and in most areas, local housing markets suffered substantial reversals.  This left many homeowners who were over-leveraged to begin with, unable to continue to pay their mortgages, or unwilling to do so because their homes were now "underwater."  As the level of borrower defaults increased, so did the rate of foreclosures, which in turn increased the downward pressure on real estate prices.

31.     Beginning in or about 2009, banks like BANA realized that at least in certain circumstances, it was better for them to renegotiate the terms of borrower loans – and thus keep an income stream going – than to foreclose and try to sell the foreclosed property for a loss in a downward-spiraling real estate market.

32.     In or about 2009 BANA began to aggressively pursue loan modifications in situations where BANA felt the circumstances were appropriate for it to do so. BANA undertook a massive marketing program soliciting borrowers for loan modifications. Plaintiffs' loans, and the class of borrowers Plaintiffs' allege to represent, were each modified during this period.  It is alleged that hundreds of thousands of persons, like Plaintiffs, had their loans modified by BANA during the proposed class period. It is this class of persons Plaintiffs' purport to represent in this class action.

33.     Loan    modifications    were    uniformly    accomplished    through    an addendum/amendment to the original loan agreement.    In short, the original loan agreement would survive, but certain of its terms, such as the interest rate to be charged and/or the term of the loan, were changed.  True and correct copies of Plaintiff Smith's original note, deed of trust, and loan modification agreement are attached hereto as Exhibits "A", "B", and "C" and incorporated herein as though set forth in full by this reference.  True and correct copies of Plaintiff Himple's original note, deed of trust, and loan modification agreement are attached hereto as Exhibits "D", "E", and "F" and incorporated herein as though set forth in full by this reference.

## III.

## PLAINTIFFS' INDIVIDUAL LOAN HISTORIES AND PAYMENTS OF MORTGAGE INTEREST THAT WERE NOT CORRECTLY REPORTED BY BANA ON FORM 1098

### A.    Lora Smith

34.     On or about August 9, 2006, Plaintiff Smith ("Smith") obtained a mortgage loan from Advantix Lending, Inc. in the amount of $376,000 on her principal residence located at 25722 Lupita Drive, Santa Clarita, California.   Smith's loan was originally an Option Arm loan where she was allowed the option to pay less than the full interest due in a given month and to defer payment of that interest to a later time.  Smith alleges that the note securing her loan provides that "each monthly payment will be applied… to interest before principal."  Smith also alleges her deed of

trust provides language to the same effect.

35.    At some point after entering into her loan, Smith's loan was acquired by Countrywide Financial Corporation.   On or about June 6, 2009, BANA acquired Smith's loan as part of its acquisition of Countrywide Financial Corporation.   BANA assigned 129906299 to Smith's loan as its loan number.   At the time BANA took over Smith's loan, her loan balance was $403,573.91, or $27,573.91 over the original $376,000 borrowed principal.   The $27,573.91 was deferred interest as a result of negative amortization.   During 2009, Smith continued to accrue additional deferred interest. At the end of 2009 her loan balance was $404,695.52, which included $28,695.52 in deferred interest.

36.    In 2009, Smith began to experience financial distress, fell behind on her payments, and sought to modify her loan with BANA.

37.    In approximately October 2009, BANA, as part of the loan modification program, put Smith on a three-month trial program.   She made her payments under the trial program.   In or about February 2010 her loan modification was granted.

38.    At the time Smith's loan modification became effective, BANA capitalized her entire loan balance – which BANA's modification agreement specifically specified included "unpaid interest" as well as other charges such as property tax and insurance payments that had been charged by BANA when she was in default.   BANA kept Smith's original loan number post-modification.

39.    At the time that Smith formally entered into the loan modification agreement, the total balance due on her loan, according to BANA, was $413,558.13.[16] This amount consisted of the $376,000 original principal and $28,695.52 in interest that was deferred and constituted negative amortization pursuant to her Option Arm loan prior to her default.   The balance consisted of taxes, insurance and unpaid interest that arose after her default.   BANA refers to this aggregate of amounts in its loan

---

[16] Again, because of the loan modification trial period, plaintiff Smith does not have records sufficient to identify exactly how BANA calculated this sum.

modification agreement as the "New Principal Balance."  Again, BANA specifically recognizes in the modification agreement that the New Principal Balance includes "all amounts of arrearages that will be past due as of the Modification Effective Date (**including unpaid and deferred interest**, [17] fees, escrow advances and other costs). (Emphasis added).

40.    Among the other terms of the loan modification agreement was the elimination of the payment "option" features of Smith's original note. Specifically, her loan modification agreement states:  "I understand that, if I have a pay option adjustable rate mortgage loan, upon modification, the minimum monthly payment option, the interest-only, or any other payment options will no longer be offered and that the monthly payments described in the above payment schedule for my modified loan will be the minimum payment that will be due each month for the remaining term of the loan.  My modified loan will not have a negative amortization feature that would allow me to pay less than the interest due resulting (sic) any unpaid interest to be added to the outstanding principal balance."  Thus, from the date that the loan was modified, it ceased to be an Option Arm loan and Smith was required to make a set monthly payment to pay the accrued interest, deferred and unpaid interest and principal over the amortized period.

41.    Smith's loan modification agreement further provides that of the total $413,558.13 loan balance, BANA would defer collecting $67,077.48 and make that obligation a "balloon" payment due when she sold or refinanced her loan, or at the conclusion of her payment schedule.   Additionally, BANA's loan modification

---

[17] While the distinction is made in BANA's loan modification agreement between "deferred interest" and "unpaid interest," the distinction is one without a difference for purposes of this case.  The former refers to negative amortization accrued by the borrower voluntarily electing to make minimum payments under their Option Arm loan, while the latter refers to interest accrued by a borrower as a result of being in default, i.e. not making their payments.  But for purposes of tax law, interest is simply money charged for the use of money; both types of interest are thus reportable on Form 1098 and deductible under 26 U.S.C. Section 163(a).

agreement specifies that it would not charge interest on this balloon payment amount. As to the $346,480.67 balance – what BANA refers to as the "Interest Bearing Principal Balance" – BANA amortized this amount over 40 years at varying interest rates over a fixed payment schedule – the first five years at 2% interest; year six at 3%; year 7 at 4%; and years 8-40 at 5%).

42.     Smith's loan modification agreement is not a new loan or a novation. Indeed, the loan modification agreement specifically provides that it is just that, a modification of her original note and that provisions that were not specifically modified by the loan modification agreement, remained in effect.  The original deed of trust also continued to secure the loan.  Among those provisions in Smith's original note that were not modified was the allocation of payments provision, which provides that payments shall be allocated to retire interest prior to retiring any principal.

43.     Smith has made all payments required of her under her modified loan agreement.

44.     Smith, like most residential borrowers is a cash-basis tax payer. As a cash-basis taxpayer, she is entitled to deduct the amount of mortgage interest she pays each year.  However, she is only entitled to deduct that interest in the year in which it is actually paid.  She cannot pick and choose the year in which interest paid on her loan will be deducted.  If interest is paid in a specific tax year, and not deducted in the year it is paid, the deduction is forever lost.

45.     In determining the amount of the deduction to be taken in any given year, Smith has relied on the 1098 Form she receives from her lenders, including BANA. Plaintiffs, their accountants and the IRS normally, reasonably and justifiably rely on the 1098 Forms prepared by the lenders, and in this case BANA.

46.     BANA did not provide Smith with a correct Form 1098 for tax years 2010, 2011 and 2012. BANA breached its contract by not properly allocating her post loan modification payments to accrued interest, deferred interest and then only to principal as provided for in her loan documents which remained unmodified post modification.

47. To illustrate what BANA is doing wrong, during tax-year 2011, Smith made 12 payments under her modified loan agreement totaling $17,457.06. But for tax year 2011, BANA only reported on Smith's Form 1098 that she had paid $6,764.01 in mortgage interest. This is wrong.

48. As of January 1, 2011, Smith's loan balance was still well in excess of the $376,000 original principal she had borrowed. As stated, BANA's loan modification agreement specifically states that the New Principal Balance or "Modified Principal Balance" – includes, in part, past due, unpaid interest. Since any payments are required, by the terms of her note/deed of trust, and by tax law generally, **to be applied to interest before principal,** the entirety of her mortgage payments for 2011 should have been applied toward reducing her total interest balance (current accrued interest and deferred interest) before being applied to reduce "principal." In other words, all of Smith's monthly payments were required to be applied to retiring her interest obligation, whether current or accrued and past due before any dollars of the payment could be applied to the unpaid principal.

49. During tax year 2010 BANA had breached, and in 2012, BANA continued to breach, its contract with Smith by using the same wrongful method to allocate her interest payments and thus it continued to calculate the amount to be reported on the Form 1098 issued to her wrongly.

50. At no time prior to entering into the loan modification, nor indeed in any of the myriad loan modification documents that were sent to Smith, did BANA ever explain or disclose that by entering into a loan modification with BANA, it was going to cease abiding by its allocation provision or that BANA would not continue to report all of her paid interest on Form 1098 so that she would be lose the opportunity to deduct the interest she had accrued on her original loan by reasonably relying on the Form 1098 BANA would provide to her after her loan modification. Nor, at the time, did Smith understand the import of the distinctions between accrued and current interest. Smith contends that the fact that BANA was intending to change the allocation provision of

1  her note as a consequence of her entering into the loan modification agreement was a

2  material non-disclosure by BANA which may have affected her decision to enter into

3  the loan modification agreement.  Like Plaintiff Himple, Smith further alleges that

4  BANA did not disclose these facts to any of its loan modification borrowers.  Nor would

5  any reasonable borrower anticipate this would be the result of entering into a loan

6  modification agreement since the loan modification was just that, a modification of the

7  already existing loan.  BANA's failure to disclose its secret intent to wipe clean the

8  interest off of its books and/or fail to abide by the allocation terms of its loan contract

9  and/or to convert interest into principal was wrongful and fraudulent and done for its

10  own benefit to the detriment of Plaintiff Smith and all persons similarly situated.

11  **B.    Cynthia Himple**

12      51.    On or about February 13, 2007, Plaintiff Himple ("Himple") obtained a

13  mortgage loan from Flagstar Bank, FSB in the amount of $500,000 on her principal

14  residence located at 10963 Shetland Ave., Montclair, California 91763.  Her loan was

15  originally an Option Arm loan, where she was allowed the option to pay less than the

16  full interest due in a given month and to defer the payment of that interest to a later

17  time.  The loan number for her loan was 168522731.  Her deed of trust states in

18  paragraph 2 that: "except as otherwise described in this Section 2, all payments accepted

19  and applied by Lender shall be applied in the following order of priority: (a) interest

20  due under the Note; (b) principal due under the Note; and (c) amounts due under Section

21  3…   Her deed of trust also provides that ""Except as otherwise described…, all

22  payments accepted and applied by Lender shall be applied in the following order of

23  priority: (a) interest due under the Note; (b) principal due under the Note; (c) [escrow

24  items such as mortgage insurance]."

25      52.    At some point after 2007, Himple's mortgage was acquired by

26  Countrywide Financial Corporation.  One or about June 6, 2009, BANA acquired

27  Plaintiff Himple's loan as part of its acquisition of Countrywide Financial Corporation.

28  Over the years of her loan with lenders prior to BANA, Himple exercised her "option"

and did not pay the full amount of interest due each month. What she did not pay became deferred interest.  At the time BANA acquired her mortgage, her loan balance was $538,010.09, or $38,010.09 over the original $500,000 principal.  With the exception of $354.16 in late charges, the entirety of this $38,010.09 was deferred interest as a result of negative amortization.[18]

53.    In 2010, Himple experienced financial distress and fell behind on her mortgage payments.   She did not make any payments to BANA in 2010 while she sought to obtain a loan modification.

54.    In or about May 2011, BANA and Himple entered into a loan modification trial period agreement.  This agreement provided that if she paid the trial payments for 3 months she would be eligible for a loan modification.  She did make the payments and BANA extended the loan modification.

55.    At the time that Himple entered into the formal loan modification agreement in or about November 2011, the balance due on her loan, according to BANA, was $617,501.68.[19]  This amount consists of the $500,000 original principal, the $38,010.09 in deferred interest that constituted negative amortization pursuant to her Option Arm loan prior to her default, with the balance consisting of unpaid interest that arose after her default.[20]

56.    The loan modification agreement continued to reference 168522731 as the loan number.  No new loan number was created post-modification.   BANA continues to use this same loan number.

57.    One of the terms of the loan modification agreement required Himple to make principal and interest payments throughout her new repayment period according

---

[18] It is undisputed that had Himple paid this $38,010.09 to BANA and the previous lenders over the years those payments would indisputably be interest payments and would have been included in a Form 1098 in the year in which it was paid.

[19] Because of the loan modification trial period, Himple does not have records sufficient to identify exactly how BANA calculated this sum.

[20]  Himple believes that a few hundred dollars of the $617,501.68 consists of late fees. This amount is de minimus.

**THIRD AMENDED CLASS ACTION COMPLAINT**

to a fixed schedule.  As such, her loan ceased to be an Option Arm loan from the date the modification was entered into, and all of her payments since that time have not been payments on an Option Arm loan but payments of principal and interest on a regular amortized loan schedule.

58.    During the trial period, and since entering into her actual loan modification agreement, Himple has made all payments required of her.

59.    Himple, like virtually all residential borrowers, is a cash-basis taxpayer.

60.    During tax-year 2012, Himple made 12 payments under her modified loan agreement totaling $45,754.93.   As of January 1, 2012, her loan balance was approximately $614,500, or $114,500 above the original $500,000 principal amount. Virtually the entirety of this $114,500 was mortgage interest that BANA charged her for the use of the original $500,000 principal.  As such, to the extent Himple made any payments to BANA after her loan modification and prior to retiring the full $114,500 in deferred and unpaid interest, the entirety of those payments should have been reported on her Form 1098 based on the "interest before principal" allocation provisions in her note and deed of trust. [21]

61.    BANA did not report anything other than the current interest she paid on her Form 1098 for tax year 2012.

62.    During tax years 2011, 2013, 2014 and 2015 BANA used the same wrongful method to calculate Himple's interest payments.  In each of those years, BANA did not include the true and correct amount of mortgage interest on Form 1098 to reflect the payment of current interest and deferred interest she paid.

63.    At no time prior to entering into the loan modification, nor indeed in any of the loan modification documents that were sent to Himple, did BANA explain or

---

[21] A few hundred dollars of the $614,500 January 2012 loan balance may have been attributable to late fee charges.  But given that payments are to be allocated to interest before principal or other charges, it makes no difference to the above analysis whether a small percentage of the $614,500 loan balance at the commencement of 2012 did not constitute interest.

disclose that by entering into a loan modification with BANA, the actual Form 1098s she would now receive after the loan modification would **not** include all interest she paid to BANA on her loan and, in particular, the interest she had deferred and was now repaying.   She was never told that neither she nor her accountant could **not** rely on the Form 1098 she would receive after the loan modification and that, in order to calculate the actual amount of interest she paid BANA, she should ignore the Form 1098 she would receive from BANA and do her own calculation and file an amount on her tax return that differed from the Form 1098 she received.

64.     Himple received and relied on the incorrect Form 1098 for each year since 2011 in calculating her mortgage interest deduction.

65.     In 2014 Himple learned of a case captioned *Horn v. Bank of America* upon receipt of a Notice of Class Action Settlement. That case involved the incorrect reporting of mortgage interest on Forms 1098 Bank of America had issued to borrowers holding Option Arm Mortgages. She learned that in that settlement BANA was issuing *corrected* 1098 Forms to almost 300,000 borrowers.  She understood that with these corrected Forms 1098, which included interest that had been initially deferred and then repaid, borrower/taxpayers that were still within the 3 year statute of limitations could amend their tax returns and get the appropriate credit for their mortgage deduction, and also a refund if appropriate. She contacted Class Counsel in that case.[22] After discussion with Class Counsel, based on the class definition, she concluded she was not a Class member.

66.     Having concerns about how BANA had been reporting her interest paid on Forms 1098, and understanding how BANA reported her interest on Form 1098 was similar, but not the same as the borrowers' claims in the *Horn* settlement, Plaintiff retained counsel to look into her interests and also to investigate the conduct of BANA on behalf of all borrowers as it related to the reporting on Form 1098 of deferred interest

[22] Class Counsel in *Horn* is the same counsel now representing Plaintiffs in this case, as well as Plaintiffs in the other similar cases referenced below.

when an Option Arm Loan **was modified** and converted to an amortized loan.

67.     Himple, at her own expense, also retained an accountant and had her accountant calculate all the interest she had paid to BANA in tax years 2011, 2012, 2013, consistent with her loan modification agreement, her original note and deed of trust and tax rules ("Operative Documents"). Her accountant came up with a different amount of interest paid when the payments were properly allocated pursuant to the Operative Documents.

68.     Himple made several calls to BANA and requested a correct Form 1098 for the years 2011-2013.  BANA continually refused to issue her a correct Form 1098.

69.     Although being informed by her accountant that the IRS does not normally accept deductions on Form 1040 for mortgage interest that differ from what is reported on Form 1098 by the lender, Himple nonetheless filed amended tax returns with the interest deducted in the amount her accountant believed she paid in each year, which included the accrued interest and payment towards the total amount of deferred interest.

70.     At the time Himple's amended return reached the IRS, she alleges the IRS was aware of at least 4 cases filed against various lenders in which the Plaintiffs alleged the lenders failed to properly report the payment of deferred interest on Forms 1098.

71.     Himple also alleges the IRS was aware of the settlement entered into by Bank of America in the *Horn v. Bank of America* case and that while it received notice of that settlement prior to its being approved, it declined the opportunity to intervene in that case, or to even comment on the settlement.

72.     Himple further alleges the IRS had been contacted by her counsel and informed that more than one federal judge wanted the IRS' input on the issue of whether capitalized mortgage interest should be reported on Form 1098.

73.     Himple further alleges on information and belief that the defendant lenders in these other cases, as well as BANA in the *Horn* case, all communicated with the IRS either directly or through trade associations, trying to distance themselves from any improper conduct and seeking exculpatory opinions from the IRS.

74.     Contrary to the normal practice and procedure for the processing of amended tax returns, and contrary to the IRS' long standing position that it does not accept information on a taxpayer's Form 1040 that is different from what is reported on IRS Forms used for reporting purposes (such as Forms 1099 and 1098), the IRS isolated, selected and processed Himple's amended returns which she filed correctly stating her interest payments to BANA. At the time the IRS processed her amended tax returns, the complaint in this action had been filed.  As stated, counsel for Himple was told specifically by the IRS that the IRS was flagging all tax filings made by the Plaintiffs in these cases.

75.     Having separated, segregated, flagged and isolated Himple's amended tax returns, the IRS adjusted her tax liability consistent with her declared interest deductions and sent her a refund, without comment. Not a word about the variation between the Form 1098 and the Form 1040 deduction. And no statement of any position in response to the request of at least one federal judge.

76.     However, BANA continues to refuse to provide Himple (and all the Class members that do not know about the incorrect reporting by BANA) true and correct Forms 1098. Alerted to the problem, and receiving kid glove treatment from the IRS, Himple continues to calculate the correct interest and take a deduction on her Form 1040 that varies from BANA's issued Form 1098. And the IRS remains silent, year after year, variation after variation. Getting to the point, the IRS agrees with Himple that her interest calculations are correct and her identified additional payments to BANA constitute mortgage interest.  As such, these amounts should be included on her Form 1098.

77.     As a result of BANA's failure to properly report the mortgage interest she paid in tax years 2011, 2012, 2013 and 2014, Plaintiff was damaged in that she had to retain counsel, and then an accountant to file amended tax returns and she has actually paid the accountant for services in correcting the mortgage deduction on her returns.

**THIRD AMENDED CLASS ACTION COMPLAINT**

78.     Unlike the tens of thousands of BANA borrowers, Himple was fortuitously alerted to BANA's wrongful reporting on Form 1098 by receiving notice of BANA's actions to correct a different type of wrongful reporting. With this notice, and consulting with a lawyer and her accountant, she was able to have her accountant, at significant cost and expense to her, amend her returns since they were still within the statute of limitations (3 years). However, she pleads that but for the fortuitous receipt of the BANA settlement documents, and the subsequent call with Plaintiff's counsel in that case, she would not have ever discovered or known of BANA's wrongful conduct and would have been like thousands of other borrowers that obtained loan modifications and who have lost the benefit of their mortgage interest deduction, unaware that BANA is refusing to properly allocate their monthly mortgage payments and to report the interest they pay in each calendar / tax year.

## IV.

## BANA KNOWS FROM A PRIOR LITIGATION THAT DEFERRED INTEREST HAS TO BE REPORTED ON FORMS 1098, BUT CONTINUES IN ITS WRONGFUL POLICY WITH RESPECT TO ITS PORTFOLIO OF MODIFIED LOANS

79.     Plaintiffs allege that prior to 2014, BANA was sued by two of its borrowers holding Option Arm loans for failing to report borrower-payments of previously deferred interest on its portfolio of Option Arm loans.   BANA settled that case in 2014 by agreeing, among other terms and conditions, to change its interest reporting policy prospectively for its Option Arm loan holders such that starting in 2014 it would report on Form 1098 those borrowers' payments of previously deferred interest.  BANA also agreed to issue corrected Forms 1098 for tax years 2010-2012 adjusting the amounts of interest it had previously reported to include any repayments of previously deferred interest that its Option Arm borrowers had made during those years.  Finally, BANA agreed to pay money to certain of its Option Arm borrowers who had paid deferred interest to BANA in 2009 and could attest that as a result of BANA's improper interest

reporting policy, they had suffered damages in that year.  The settlement agreement, however, specifically limited the scope of the class to include only persons holding Option Arm loans with BANA.

80.     Specifically, the two classes were defined as follows:  The damage class consisted only of: "all persons who made Payments of Deferred Interest on their Option ARMs[23] in Tax Year 2009 and for whom BANA was or would have been required by 26 U.S.C. § 6050H and 26 C.F.R. § 1.6050H-l to file a 2009 Form 1098."  The injunctive class consisted only of "all persons who made Payments of Deferred Interest on their Option ARMs in Tax Years 2010, 2011, 2012, or 2013, and for whom BANA was or would have been required by 26 U.S.C. § 6050H and 26 C.F.R. § 1.6050H-l to file a Form 1098 for the same Tax Year in which the Payments of Deferred Interest were made."  Finally, the release in the settlement agreement was specifically limited to include only claims that settlement Class members had "relating in any way to BANA not reporting on Form 1098 Payments of Deferred Interest on Option ARMs."

81.     Among the terms of Plaintiffs' notes that were modified as part of the loan modification agreements they entered into with BANA was the ability to choose among different payment options.  Thus, after the modification, neither of Plaintiffs' loans were Option Arm loans.  As such, to the extent Plaintiffs were members of the two classes mentioned above, and thus may have released claims against BANA relating to payments of deferred interest they paid while they held Option Arm loans, their release did not include their claims being made in this case relating to BANA's failure to report on Form 1098 payments of previously deferred interest that they paid post-modification.

82.     Further, Smith alleges that although her loan was originally an Option Arm loan, she was not a member of either of the above classes because she did not pay any previously deferred interest to BANA until the point of her loan modification.

---

[23] The settlement agreement defined "Option ARM" to mean "an option adjustable rate mortgage," i.e. mortgages where the note provides for both periodic interest rate adjustments and that the borrower can choose among specifically delineated payment "options" each month.

83.     Plaintiffs further allege that there are many other persons who received loan modifications on non-Option Arm loans and that BANA has not properly reported payments of deferred interest that BANA capitalized as part of the loan modification process.  These persons are in exactly the same position as plaintiffs.

## IV.

## BANA HAS REFUSED ALL REQUESTS TO CORRECT ITS WRONGFUL POLICES

84.     Plaintiffs allege that demand has been made individually by both of them to BANA to change its policy and provide correct Forms 1098 to them and that such demands have been refused.  Plaintiffs further allege that Plaintiffs' counsel have made demand on BANA to provide correct 1098s to all of its borrowers who have obtained loan modifications and that that demand was also refused in writing by BANA's outside legal counsel.

## V.

## THE SPECIFICS OF BANA'S MULTIPLE WRONGFUL ACTS

85.     Plaintiffs allege that in or about 2009, BANA unilaterally and arbitrarily changed its 1098 reporting practices such that from that tax-year forward, it wrongfully ceased reporting any payments of "deferred interest" on Forms 1098.

86.     Unlike the previously referenced alchemist that could not change lead into gold, BANA, through its senior management and policy making divisions, turned "interest" into "principal".  While there is ample authority that clearly states interest, the cost of borrowing money, never loses its character as interest, BANA, for its own purposes and financial benefit, secretly, deceptively and illegally, declared "…effective with the 2009 tax year, once interest has been capitalized (added to principal), it is no longer considered interest, and is simply part of the principal balance". (Attached as Exhibit G is a letter from the Office of the CEO and President to a borrower public stating BANA's "magical trick" which, absent this letter, was never disclosed to the public).

87.     Plaintiffs allege that after the effective dates of their loan modifications, they, and each member of the class, made monthly mortgage payments to BANA, and that all, or at least some portion of, these payments was properly allocable to the repayment of the mortgage interest that existed as part of their pre-modification loan balance.[24]   BANA wronged Plaintiffs and the members of the class by: (1) failing to report on Forms 1098 the portion of the payments Class members made to BANA after their loan modifications that constituted repayment of any mortgage interest that existed prior to the loan modification; and (2) failing to tell Class members that a consequence of entering into their loan modification agreements with BANA, BANA, in breach of their contract with borrowers, would neither properly allocate their monthly loan payments between accrued interest, deferred interest and unpaid principal nor would BANA prepare true and correct Forms 1098 that could be relied on by borrowers in reporting the amount of deductible interest reportable on Form 1040. BANA further failed to tell its borrowers entering into loan modification agreements that they would be required to calculate, on their own, the actual amount of interest paid, and use that amount, which would be different from the Form 1098, on their Form 1040 tax return, if they wanted to deduct all interest paid to BANA.

Plaintiffs allege on information and belief that there are at least two reasons why BANA knowingly and intentionally failed to notify its borrowers (and potentially the IRS) of its wrongful reporting policy.  The first reason was to eliminate income to the Bank and/or to create a paper loss.  By "converting" the pre-loan modification interest into "principal," BANA could potentially "write off" the interest income it had previously taken (on an accrual basis) while then collecting that same sum later as a repayment of "principal" that would not have to be reported as "income."  The second reason is to reduce BANA's accounting costs in tracking the amounts of mortgage interest its

---

[24] In fact, plaintiffs allege that because BANA's notes contain "interest before principal" allocation provisions, the entirety of their mortgage payments post-modification is properly allocable to repayment of any interest incurred prior to the modification until such time as all of that pre-modification interest has been repaid.

borrowers are paying.  By simply "wiping the slate clean" of all pre-existing interest, BANA is able to significantly simplify its task of "complying" with 26 U.S.C. § 6050H. But 26 U.S.C. § 6050H does not provide BANA the discretion to choose expediency over compliance. 26 U.S.C. § 6050H rather requires that BANA calculate and *accurately* report the amounts of interest (over $600) that it receives from a borrower in a given year.

## VI.

## PLAINTIFFS AND THE MEMBERS OF THE CLASS REASONABLY RELIED ON BANA TO CALCULATE THEIR INTEREST PAYMENTS AND THIS COURT IS THE PROPER FORUM IN WHICH TO SEEK RELIEF

88.    Plaintiffs allege that reliance on Forms 1098 by borrowers like them and their tax-preparers (without cross-checking) is the norm and is entirely reasonable since: (1) mortgage lenders like BANA have the legal duty imposed by Congress under 26 U.S.C. § 6050H to calculate and report those amounts accurately; (2) the IRS relies exclusively on the amounts contained in the 1098 forms it receives;  (3) the IRS maintains a policy whereby it will reject any attempt by tax-payers to claim different amounts of interest from those appearing on the tax-payer's Form 1098; (4) BANA had historically correctly reported the total amount of interest paid by borrowers each year, and unilaterally and without notice changed, altered and modified its reporting policy without notice to its borrowers.

89.    As evidenced by Exhibit G, BANA had been properly calculating payment of deferred interest, and Plaintiffs, Class members and their accountants, could and did, rely on the amounts stated on the Forms 1098 prepared by BANA. However, in 2009, BANA unilaterally and without notice changed its policy as alleged above and evidenced by Exhibit G.

90.    The IRS's policy is evidenced by Exhibit H attached hereto and incorporated herein by this reference.  Exhibit H is a redacted IRS letter sent to a tax-payer other than Plaintiffs who had a negative amortization mortgage with BANA and

who tried to independently calculate and submit to the IRS the correct amount of deferred interest that they had paid.  The IRS rejected the tax-payers' return stating that: "we [the IRS] cannot adjust the amount claimed on schedule A for mortgage interest, without a corrected Form 1098…"

91.     It is further alleged that although the Department of Justice received notice under CAFA of the eventual settlement wherein Bank of America, N.A. changed its reporting policy, the IRS chose not to involve itself in that litigation.

## VII.
## THE DAMAGES SUFFERED BY THE PLAINTIFFS AND THE CLASS AND THE NEED FOR INJUNCTIVE RELIEF

92.     BANA's decision not to tell consumers about its wrongful reporting policy in the loan modification agreement (or in any of the writings that were part of the negotiations leading up to the actual agreement) and its failure to issue correct Forms 1098 has, in many cases, had a permanent and detrimental effect on its borrowers.  Specifically, because there is a three-year statute of limitations for amending tax returns imposed by 26 U.S.C. § 6511, borrowers like Plaintiffs who modified their loans prior to 2011, and thus who paid back pre-modification deferred interest in those years, can no longer amend their tax returns to undo the effects of BANA's wrongful reporting for those years.

93.     Further, because BANA's violations of 26 U.S.C. § 6050H did not stop in 2010, the harm is continuing.  BANA has compounded its violations each and every year thereafter by only reporting the amount of "current interest" on its borrowers' Forms 1098 and ignoring all of the interest that existed on its borrowers' accounts prior to the effective dates of their loan modifications.

94.     As a direct and proximate result of BANA's wrongful conduct, although Himple was able to learn of BANA's breach of contract and violation of Section 6050 and file an amended tax return for tax years 2011, 2012 and 2013, she had to consult with counsel to first determine her right to amend, spend her own personal time and

effort in locating tax records, payments and documents to work with her accountant, and then hire and pay an accountant to file amended tax returns.  Further, as a result of BANA's continuing refusal to properly report her interest for tax years 2014, 2015 and 2016, all years in which she continued to pay BANA not only accrued interest but also deferred interest, she paid her accountant the additional cost of calculating the proper mortgage interest she has paid and is permitted to deduct in each of those calendar years. Accordingly, as a direct result of BANA's conduct, Himple has paid thousands of dollars to her accountant to rectify the damage caused by BANA.

95.    As a direct and proximate result of BANA's wrongful conduct, Smith reasonably and justifiably relied on the Form 1098 received from BANA for tax years 2010, 2011 and 2012.  Unaware of the failure of BANA to include her payment of deferred interest on Form 1098, and believing the amount reported was the correct amount allocated to mortgage interest by BANA for each tax year, Smith deducted the amount on the Form 1098 issued by BANA on her tax returns for years 2010, 2011 and 2012.

96.    Smith subsequently learned of the erroneous misreporting by BANA and hired an accountant to determine the amount of her mortgage interest for years 2010, 2011 and 2010.  She then calculated the amount of her tax liability and amount of refund for each of these tax years using the correct mortgage interest deduction. As a result of BANA's wrongful and inaccurate reporting on Form 1098, Smith did not receive refunds from the IRS for tax years 2010, 2011 and 2012 in the total amount of approximately $1,800.00.

97.    Smith, by relying on and using the erroneous Form 1098 prepared by BANA suffered damages by overpaying her tax liability for years 2010, 2011 and 2012 and not receiving a refund of no less than $1,800.00..  Smith also was damaged by having to pay accounting fees to determine the correct amount of mortgage interest she paid in years 2010, 2011 and 2012.  Plaintiff Smith cannot file an amended tax return since the three year statute of limitations has passed.

98.     Plaintiff alleges that she did not know of this misreporting by BANA, and contends that tens of thousands, if not hundreds of thousands of borrowers are completely unaware that BANA has been improperly reporting the amount of their mortgage interest paid in each calendar tax year.  To the extent other Class members have relied on BANA's erroneous Forms 1098, and have not taken the full mortgage interest deduction they are entitled to, they have each been damaged by not having their properly tax liability determined, and have lost the value of the full deduction, and, in many cases, actual monetary refunds.  If the statute of limitations has passed, their refund is forever lost.

99.     If BANA were to issue corrected Forms 1098 to Class members for years where amended tax returns can be filed, then Class members will still be damaged because they will incur the cost of amending prior returns, as in the case of Plaintiff Himple.

100.   Plaintiffs, on behalf of themselves and the members of the class, also seek injunctive and equitable relief from BANA for intentionally and/or negligently under-reporting to them, Class members, and to the IRS the "mortgage interest" payments they made post loan modification.  They also seek declaratory relief asking the Court to declare that BANA's accounting and reporting practices are wrongful and that BANA be required to issue corrected Form 1098s to Plaintiffs, Class members, and the IRS for all tax years where BANA wrongfully reported mortgage interest payments.

101.   Plaintiffs are informed and believed BANA continues to issue incorrect Forms 1098 and continues to notify, inform and advise Class member borrowers that the amount reported on Form 1098 is not the true and correct amount of interest the Class member borrowers have paid and that they are entitled to a larger mortgage interest deduction.

///

///

**THIRD AMENDED CLASS ACTION COMPLAINT**

# VII.

## THE PARTIES

102.   Plaintiffs are individuals who during all times relevant herein resided in the Central Districts of California.  They further had a mortgage loan owned and/or serviced by BANA.  Plaintiffs paid BANA more than $600 in mortgage interest in each of the tax-years since they entered into their loan modification agreements, but did not receive an IRS Form 1098 from BANA reflecting all of the interest they paid because of BANA's wrongful accounting practice previously described.

103.   Class members reside in and are located throughout the United States and in foreign jurisdictions.  Each Class member either owns a main home, second home, residential rental home, or combination thereof in the United States, or in one of its possessions or territories with BANA and has received a loan modification from BANA. Each Class member at some point in time deferred all or a portion of the interest owing BANA on the borrowed principal sum and subsequently paid all or a portion of the deferred interest after receiving a loan modification.

104.   BANA is, and at all times mentioned herein was, a National Bank with its corporate headquarters located in Norfolk, Virginia and does business in all 50 states, including California.

# VIII.

## JURISDICTION AND VENUE

105.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 2201, 2202.  Subject matter jurisdiction also exists under the Class Action Fairness Act of 2005 -- 28 U.S.C. §§ 1332(a) and 1332(d) -- because the matter in controversy exceeds $5.0 million exclusive of interest and costs and the named Plaintiffs are citizens of California and BANA is not.  Further, Class members reside, on information and belief, in every state in America.  There is therefore minimal diversity between the Class members and the defendant.  Further, more than two-thirds of the members of the putative Class members are citizens of states different from that of the

defendant and this case does not present a local controversy.

106. This Court has personal jurisdiction over BANA because, among other things, BANA does business in the State of California and in this Judicial District, and because BANA has established minimum contacts with California such that the exercise of jurisdiction over it will not offend traditional notions of fair play and substantial justice. Indeed, BANA has voluntarily conducted business and solicited customers in the State of California for its loans, including in this Judicial District and continues to commit the wrongful acts alleged herein against California residents within this Judicial District.

107. Venue is proper in this Judicial District under 18 U.S.C. §1391 and 1965. BANA can be found in, has one or more agents in, and/or transacts or has transacted business in this judicial district. Finally, the loan transactions involving the Plaintiffs and BANA occurred in this Judicial District.

## IX.

## CLASS ALLEGATIONS

108. Plaintiffs bring this action on their own behalf and on behalf of classes of persons similarly situated pursuant to Rule 23(a) and 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

109. Plaintiffs seek to represent a damage class of:

> "all persons who: (1) have or had a BANA mortgage secured by real property in the United States (or in its territories and protectorates); (2) had their loan modified; (3) owed previously deferred or unpaid interest that was not forgiven as part of the modification; (4) made monthly mortgage payments to BANA after receiving their loan modification; and (4) made those payments in a year for which, because of the passage of the statute of limitations for amending tax returns, it is too late for

1    the person to amend their tax returns to correctly state amount of

2    mortgage interest they paid during that year."[25]

3    110.   Plaintiffs also seek to represent an injunctive class of:

4         "all persons who: (1) have or had a BANA mortgage secured by

5         real property in the United States (or in its territories and

6         protectorates); (2) had their loan modified; (3) owed previously

7         deferred or unpaid interest that was not forgiven as part of the

8         modification; (4) made monthly mortgage payments to BANA

9         after receiving their loan modification; and who (5) made those

10        payments in a year for which they can still amend their tax

11        returns to state the correct amount of mortgage interest they paid

12        during that year."[26]

13   111.   Plaintiffs further assert that if for any reason that a national class is not

14   certified, a California-only class should be certified consisting of all members of the

15   above classes whose properties securing their mortgages are located in California.

16   Plaintiffs further reserve the right to amend the definition of these classes, or to amend

17   their complaint to state appropriate sub-classes following discovery.   Plaintiffs do not

18   know the exact size of the classes or the identities of the Class members since such

19   information is in the exclusive control of BANA.  They believe, however, that the

20   class (and the California subclass) encompasses at least tens of thousands of

21   individuals who are geographically dispersed throughout the United States and in

22

23

[25] This class definition assumes that BANA will be ordered to issue corrected Forms 1098 in the correct amounts for all of the years for which it is not too late to file amended returns.  To the extent that corrected Forms 1098 are not issued, the damage class would include all persons who meet the first three prongs of the above definition.

[26] This definition again assumes that the Court will order BANA to issue corrected Forms 1098s for the years for which the Class members can still file amended returns with the IRS.

**THIRD AMENDED CLASS ACTION COMPLAINT**

1  foreign nations.  The number of members in the classes are so numerous that joinder

2  of all Class members is impracticable.

3      112.   There are numerous questions of law and fact common to the classes that

4  will predominate over any questions affecting only individuals.  Among these

5  common questions are:

6      a.      Whether any portion of the deferred or unpaid interest that was not

7  specifically forgiven by BANA continues to be "mortgage interest" after it has been

8  capitalized by way of a loan modification?

9      b.      If such amounts continue to be mortgage interest post-modification, does

10  BANA have the obligation to report repayments of that interest on Forms 1098?

11      c.      How borrowers' payments should be allocated, i.e. between interest and

12  principal.

13      d.      Whether in some years BANA under-reported Class members' mortgage

14  interest on Form 1098.

15      e.      Whether BANA had the right to unilaterally "convert" borrowers' deferred

16  or unpaid mortgage interest into "principal" as part of the loan modification process

17  without telling them that BANA would no longer report on Form 1098 the true and full

18  amount of mortgage interest borrowers would pay for accrued and deferred interest and

19  whether the failure to do so constituted an unfair business practice.

20      f.      Whether BANA maintains written and/or unwritten policies, procedures

21  and/or practices concerning the accounting and reporting of mortgage interest payments

22  received by BANA from Class members, and whether those policies have changed over

23  time

24      g.      Whether BANA had a duty to disclose to its borrowers that (due to

25  BANA's 1098 reporting policies) a consequence of their entering into the loan

26  modification agreement would be that BANA would no longer report on Form 1098 the

27  true and full amount of interest borrowers would pay for accrued and deferred interest

28  in each tax year.

h.     If BANA had had a duty to disclose to its borrowers prior to their entering into the loan modification that BANA would not follow its previous policy of reporting all interest the borrower paid to BANA on Form 1098 but would only include accrued but not deferred interest paid on Form 1098.

i.     Whether BANA acted intentionally or negligently in committing its wrongs against the Class members?

j.     What injunctive relief would be appropriate to prevent further wrongful conduct by BANA?

k.     What remedial measures would be appropriate to remedy the wrongs that have been done by BANA to the members of the class? and

l.     Whether punitive damages should be awarded against BANA?

113.    The claims of the Plaintiffs are typical of the claims of the classes and do not conflict with the interests of any Class members in that both the Plaintiffs and the Class members were subjected to the same wrongful policies, practices and procedures of BANA and all have an interest (and legal duty) to assure that their taxes are properly stated.

114.    The Plaintiffs will fairly and adequately represent the interests of the other Class members.  The Plaintiffs have retained skilled and experienced counsel to represent the class in this class action litigation.

115.    Prosecution of separate actions by individual Class members will create the risk of adjudications with respect to individual Class members which would, as a practical matter, be dispositive of the interests of Class members who are not parties to those adjudications and would/could substantially impair or impede their ability to protect their interests.

116.    In adopting and implementing the policies, practices and procedures herein-alleged, BANA has acted, failed, or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or declaratory relief with respect to the class as a whole.

**THIRD AMENDED CLASS ACTION COMPLAINT**

117.   The class action is superior to other available methods for fairly and efficiently adjudicating the issues concerning whether BANA's policies, practices and procedures in accounting for and reporting the payment of deferred and unpaid mortgage interest received by BANA have class-wide impact and effect.

## COUNT I
## BREACH OF CONTRACT

118.   Plaintiff re-alleges and hereby incorporates each and every allegation contained in Paragraphs 1 through 117 of this Third Amended Complaint as though fully set forth herein.

119.   At the time Plaintiffs Smith and Himple, as well as each Class member, originated their loan, BANA, or its predecessor in interest, provided each of them with an Adjustable Rate Note ("Note") and a separate Deed of Trust ("Deed") securing the Note. These documents formed the contractual agreement between Plaintiffs, Class members and BANA. Ex. "A" is Smith's Note, Ex. "B" is Smith's Deed, Ex. "D" is Himple's Note, Ex. "E" is Himple's Deed.  These exhibits are incorporated herein as though set forth in full.  The Note and Deed are often referred to as the "**Loan Documents**".  Throughout this Third Amended Complaint, Plaintiffs will refer to these two documents, which constitute the contract between Plaintiffs and BANA, as the Loan Documents or Contract. Each of these documents are, for all intents and purposes, standard form documents with substantially the same language used across the nation in all of BANA's loans. [27]

120.   The Loan Documents form the contractual relationship between the Plaintiffs, Class members and BANA, subject to any modifications, including the Loan Modifications entered into by Plaintiffs. Plaintiff Smith's Loan Modification is Ex. "C".  Plaintiff Himple's Loan Modification is Ex. "F".  The Loan Modifications

---

[27] Although there is minimal variation in some of the language, the Notes and Deeds acquired by BANA through its purchase from other lenders contain substantially the same language regarding the lender's receipt of proceeds as payment on ARM loans, as well as the allocation of the proceeds received.

**THIRD AMENDED CLASS ACTION COMPLAINT**

will hereafter be called "Modification(s)" and are incorporated herein by this reference as if set forth in full.

121.    At all relevant times, the Loan Documents were in full force and effect and the parties to the Loan Documents were obligated to follow their terms and conditions.

122.    At all times that BANA collected proceeds as payments on the loans, BANA had the contractual obligation to allocate the proceeds it received between Principal (a defined term in the Note, Ex. A ¶1, Ex. D, ¶1) and interest (an undefined term in the Note).

123.    The allocation of payments between interest and Principal is a term of the Loan Documents.  Smith's Note contains the following language: "Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal". Ex. A, ¶3,   Himple's Note contains the following language: "Each monthly payment will be applied as of its scheduled due date, and if the payment includes both Principal and interest, it will be applied to interest before Principal". Ex. D, ¶3.  The allocation between Principal and interest is important to the borrower since the amount BANA calculates as interest is reported to the IRS on Form 1098 and also provided to the borrower to use for purposes of the mortgage interest deduction on that year's tax return.

124.    In addition to the Notes, the Deeds also contain language that states how BANA will allocate proceeds received as payment on the loan. The Deeds contain the following language:

> THE SECURITY INSTRUMENT combines **uniform covenants** for ***national use*** and non-uniform covenants with limited variations by jurisdiction to constitute a **uniform security instrument** covering real property.
>
> ***UNIFORM COVENANTS***. Borrower and Lender covenant and agree as follows:
>
> ***

**THIRD AMENDED CLASS ACTION COMPLAINT**

2.    Application of Payments or Proceeds.    Except as otherwise described in this Section 2, **_all payments_** accepted and applied by Lender **_shall_** be applied in the following order of priority: (1) interest due under the Note; (b) principal due under the note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal of the Note.    (Emphasis added) Ex. B and Ex. D, pps 3-4.

125.    Accordingly, there is **clear, unambiguous and unequivocal language in the contract,** drafted by BANA and provided to Plaintiffs, that states BANA and Plaintiffs (and Class members) covenanted and **agreed** how Plaintiffs' mortgage payment proceeds would be allocated by BANA. Plaintiffs allege that prior to their Modifications, BANA allocated their mortgage payments consistent with its contractual obligation.

126.    Plaintiff Smith ("Smith") has alleged in detail, at ¶¶37-39, the facts giving rise to her Modification.  BANA offered Smith a modification to her existing loan and she accepted that offer. All of the terms of Smith's Modification are stated in Ex. C.

127.    At the time of the Modification, Smith not only owed BANA the original Principal balance representing the amount borrowed, but also $37,655.93 in unpaid interest.

128.    The Modification continued to reference Smith's existing BANA Option Arm Loan and no new loan number was assigned as a result of the Modification.

129.    Accordingly, as of the date of the closing of the Modification, Smith, owed to BANA the sum of the Principal borrowed, as defined in the Note and Deed, plus unpaid interest and some incidental charges.

130.    As a result of the Modification, the total amount owing to BANA did not change. However, by structuring a new payment schedule, BANA wanted to charge Smith interest on the unpaid interest it was now amortizing over time. BANA could

not charge Smith (or Himple or Class members) interest on the "unpaid interest" without calling it something other than "unpaid interest". Because BANA wanted to be able to charge interest not only on the unpaid borrowed Principal balance, but also on the unpaid deferred interest (commonly known as "capitalized interest"), BANA created a new "catch-all" term for the bucket containing the balance owing on the original amount borrowed plus the unpaid or deferred interest.

As part of the Modification, BANA stated:

HOME AFFORDABLE MODIFICATION AGREEMENT

\*\*\*

3.   **The Modification.**

\*\*\*

B.   The modified Principal balance of my Note will include all amounts and arrearages that will be past due as of the Modification Effective Date (including **unpaid and deferred interest,** fees, escrow advances and other costs, but excluding late charges, collectively **"Unpaid Amounts")** less any amounts paid to the Lender, but not previously credited to my Loan. The new Principal balance of my Note will be $413,558.13 (the "New Principal Balance"). I understand that by agreeing to add the Unpaid Amounts to the outstanding principal balance, the added Unpaid Amounts accrue interest based on the interest in effect under this Agreement. I also understand that this means interest will now accrue **on the unpaid interest that is added to the outstanding principal balance,** which would not happen without this Agreement.

131.   In other words, the Modification said that Smith still owed unpaid Principal and unpaid interest, but BANA was going to create a "new Principal balance" comprised of these two components in order to charge interest on the

**THIRD AMENDED CLASS ACTION COMPLAINT**

"unpaid interest portion" of the "new Principal balance." Without doing this, as stated by BANA, no interest would be charged on the "unpaid interest." The Modification, however, did not state that the "unpaid interest" which was "capitalized" would lose its character as interest (i.e. the cost of borrowing money) and treated as such by BANA.

132.   Additional terms of the Modification included Smith acknowledging that the Modification removed all options as an ARM loan and she was now required to make fixed payments of principal and interest, (Ex. C, ¶3(c)), that she would comply with all covenants, agreements and requirements of the original Loan Documents (Ex. C, ¶4(c)), and all the terms and provisions of the Loan Documents, **except as expressly modified in the Modification,** remain in full force and effect (Ex. C, ¶4(F).

133.   Smith signed this Modification on January 29, 2010.  BANA signed this Modification on March 24, 2010.  By executing this Modification, Smith alleges that all the terms requiring performance by Smith consistent with the Loan Documents are reciprocal and that BANA also is bound by the terms of the Modification, in particular those stated in ¶ 4(F).

134.   Smith alleges that notwithstanding the use of many different words, such as "Unpaid Amounts", "modified Principal balance" and "new Principal balance", it did not change the actual amount of money due to BANA for repayment of the original amount borrowed ($376,000) **plus** deferred or unpaid interest (the cost of borrowing the money). It just changed the terms of payment and now allowed BANA to charge interest on the unpaid deferred interest.

135.   Smith alleges BANA was still required to allocate her monthly payments according to the Loan Documents and Deed.  The Modification did not change, alter or modify the obligation to allocate the payments according to the Note and Deed by applying proceeds first to interest (accrued or unpaid) and then anything remaining to principal.  Since "interest," is not defined anywhere in BANA's Loan Documents, it would be reasonable for borrowers like Smith to assume that interest as used in the

BANA Loan Documents followed the common definition of interest, which is money that is charged for the use of money.  Moreover, even if the word interest is ambiguous, as the drafter of the Loan Documents, any ambiguity in the term interest must be construed against BANA.

136.   Smith made all payments required of her under her Loan Documents and complied with all terms and conditions of the Loan Documents as modified in 2010.

137.   BANA breached its contractual agreement with Smith and did not properly allocate the mortgage payment proceeds it received from Smith after it entered into the Modification agreement. BANA breached its contract by not properly allocating her post Modification payments first to "interest" (Smith had both accrued interest and deferred interest as part of her loan balance at the time she entered into the loan modification agreement) and then only to Principal as unambiguously stated in her Loan Document.

138.   To illustrate how BANA breached the contract, during tax-year 2011, Smith made 12 payments under her Modified loan agreement totaling $17,457.06. But for tax year 2011, BANA only reported on Smith's Form 1098 that she had paid $6,764.01 in mortgage interest.  This is wrong.  BANA did not properly allocate the proceeds it received.

139.   BANA's Modification agreement with Smith specifically states that the new Principal balance or "modified Principal balance" – **includes**, in part, past due, unpaid interest.  Since any payments are required, by the terms of her Loan Documents, and by tax law generally, **to be applied to interest before principal,** the *entirety* of her mortgage payments for 2011, should have been applied toward reducing her total interest balance (current accrued interest and deferred interest) before being applied to reduce "Principal." In other words, all of Smith's monthly payments were required to be applied to retiring her interest obligation, whether current or deferred, before any dollars of the payment could be applied to Principal.

140.   During tax year 2010 BANA had breached, and in 2012, BANA

continued to breach, its contract with Smith by using the same wrongful method to allocate her interest payments. Because BANA has a statutory obligation to report to the IRS, the taxpayer interest it receives in excess of $600 in the year in which it was paid, BANA did not properly report to the IRS, or inform Smith, of the correct amount of interest Smith paid in years 2010, 2011 and 2012.

141.   Smith, relying on the incorrect Form 1098 that were prepared by BANA in accordance with its breach, filed tax returns taking a mortgage interest deduction in an amount less than she was entitled to take.  She therefore overpaid taxes. Smith later incurred the expense of paying accountancy fees to determine what she should do as a result of BANA's erroneous reporting.  Ultimately, Smith determined not to incur the further substantial cost of amending her returns, but rather to seek her overpaid taxes as damages against BANA.

142.   Plaintiff Himple ("Himple") has alleged in detail, at ¶¶ 54-56, the facts giving rise to her Modification. BANA offered Himple a modification to her existing loan and she accepted that offer.  All of the terms of Himple's Modification are stated in Ex. F.

143.   At the time of the Modification, Himple not only owed BANA the original Principal balance representing the amount borrowed, but also approximately $114,500 in unpaid interest.[28]

144.   The Modification continued to reference Himple's existing BANA Option Arm Loan and no new number was assigned as a result of the Modification.

145.   Accordingly, as of the date of the closing of the Modification, Himple owed to BANA the sum of the Principal borrowed, as defined in the Note and Deed, plus unpaid interest and some incidental charges.

146.   Like in the case of Smith, the total amount owing to BANA did not change as part of the Modification.  However, consistent with its intent to charge interest on unpaid interest ("capitalized interest"), BANA had to change the name of

_____
[28] Himple has never learned the actual amount from BANA.

the" unpaid interest" to something else, otherwise it would not be permitted to capitalize the interest.  Himple's Modification is much more abbreviated than Smith's. Unlike Smith, where BANA was creative with terms such as "Principal", "Unpaid Amounts" and new Principal balance." in Himple BANA just called the "aggregate" amount owed to BANA at the time of the closing of the Modification the "Unpaid Principal Balance." It stated this Unpaid Principal Balance is $617,501.86 "consisting of the amount(s) loaned to the Borrower by Lender, which may include, but are not limited to, any past due principal payments, **interest,** fees and/or capitalized costs to date" Ex. F, ¶1.

147.   Nowhere does this Modification state the unpaid interest, now being swooped up into the singular total amount due and arbitrarily being renamed by BANA as the  "Unpaid Principal Balance", loses its character as interest owed to BANA.  In fact, it specifically says that the "Unpaid Principal Balance" *includes* interest.

148.   The Modification also states: "*Except as otherwise specifically provided in the Agreement, the Note and Security Instrument will remain unchanged, and the Borrower and Lender will be bound by, and comply with, all terms and provisions [sic] as amended by this Agreement.* Ex. F, ¶6.

149.   The Modification also stated Himple would comply with all covenants, agreements and requirements under the Security Instrument (Deed). Ex. F, ¶4. Himple alleges the language in ¶4 is reciprocal and BANA is also bound to comply with all covenants, agreements and requirements under the Security Instrument.

150.   Himple further alleges that ¶6, cited above, unambiguously and unequivocally binds BANA to comply with all terms of the Note and Deed. Himple alleges at no time was she or BANA excused from performance under the terms of the Security Instrument.

151.   Himple made all payments required of her under her loan payments and complied with all terms and conditions of the Loan Documents as Modified in 2011.

152.   BANA breached its contractual agreement with Himple and did not properly allocate the mortgage payments it received from Himple after it entered into the Modification agreement. BANA breached its contract by not properly allocating her post Modification payments first to "interest" (Himple had both accrued interest and deferred interest as part of her loan balance at the time her modification took effect) and then only to Principal, as unambiguously provided for in her Loan Documents.

153.   Himple, like virtually all residential borrowers, is a cash-basis taxpayer.

154.   During tax-year 2012, Himple made 12 payments under her modified loan agreement totaling $45,754.93.  As of January 1, 2012, her loan balance was approximately $614,500, or $114,500 above the original $500,000 principal amount. Virtually the entirety of this $114,500 was mortgage interest that BANA charged her for the use of the original $500,000 principal.  As such, to the extent Himple made any payments to BANA after her loan modification and prior to retiring the full $114,500 in deferred and unpaid interest, the entirety of those payments should have been, according to the Note and Deed, allocated first to interest and then to Principal.[29] Again, the term interest is not defined in Himple's Loan Documents.  Since "interest," is not defined anywhere in BANA's Loan Documents, it would be reasonable for borrowers like Himple to assume that interest as used in the BANA loan documents followed the common definition of interest, which is money that is charged for the use of money.  Moreover, even if the word interest is ambiguous, as the drafter of the Loan Documents, any ambiguity in the term interest must be construed against BANA.

155.   BANA breached its contractual agreement with Himple and did not

---

[29] A few hundred dollars of the $614,500 January 2012 loan balance may have been attributable to late fee charges.  But given that payments are to be allocated to interest before principal or other charges, it makes no difference to the above analysis whether a small percentage of the $614,500 loan balance at the commencement of 2012 did not constitute interest.

properly allocate the mortgage payment proceeds it received from Plaintiff Himple after it entered into the Modification agreement. BANA breached its contract by not properly allocating her post Modification payments first to "interest" (Plaintiff had both accrued interest and deferred interest) and then only to principal as unambiguously provided for in her Loan Documents.  The allocation provision in her Loan Documents was not referenced, addressed, changed or altered in the Modification documentation.

156.   As a result of the breach of contract in failing to properly allocate the proceeds received from Himple, BANA did not correctly report to the IRS and Himple, on Form 1098, the correct amount of mortgage interest BANA had been paid.

157.   During tax years 2011, 2013, 2014 and 2015 BANA continued to breach the contract by using the same wrongful method to calculate Himple's interest payments.  In each of those years, BANA did not allocate the proceeds first to interest and then to principal.

158.   At no time prior to entering into the Modification, nor indeed in any of the Modification documents that were sent to Himple, did BANA explain or disclose that by entering into a loan modification with BANA, BANA would disregard its contractual agreement set forth in the Loan Documents to allocate all proceeds first to interest and then to principal.   She was also never told that neither she nor her accountant could rely on the Form 1098 being issued by BANA as the proper allocation of her proceeds between interest and principal payments.

159.   Himple received and relied on the incorrect Form 1098 for each year since 2011 in calculating her mortgage interest deduction. She was not aware that BANA had breached its contractual agreement in allocating her monthly mortgage payments.

160.   Himple, at her own expense, retained an accountant and had her accountant calculate all the interest she had paid to BANA in tax years 2011, 2012, 2013, consistent with her Loan Documents as Modified. Her accountant came up with

a different amount of interest paid when the payments were properly allocated pursuant to the Loan Documents.

161. Himple made several calls to BANA and, advised it of her accountant's findings and requested BANA properly allocate her payments and issue her a correct Form 1098. BANA refused to do so.

162. Although being informed by her accountant that the IRS does not normally accept deductions on Form 1040 for mortgage interest that differ from what is reported on Form 1098 by the lender, Himple nonetheless filed amended tax returns with the interest deducted in the amount her accountant believed she paid in each year, which included the accrued interest and payment towards the total amount of deferred interest.

163. Contrary to the normal practice and procedure for the processing of amended tax returns, and contrary to the IRS' long standing position that it does not accept information on a taxpayer's Form 1040 that is different from what is reported on IRS Forms used for reporting purposes (such as Forms 1099 and 1098), the IRS isolated, selected and processed Himple's amended returns which she filed correctly stating her interest payments to BANA. At the time the IRS processed her amended tax returns, the complaint in this action had been filed.  As stated, counsel for Himple was told specifically by the IRS that the IRS was flagging all tax filings made by the plaintiffs in these cases. The IRS's treatment of her return, in short, was not the sort of treatment the average taxpayer would receive.

164. Having separated, segregated, flagged and isolated Himple's amended tax returns, the IRS adjusted her tax liability consistent with her declared interest deductions and sent her a refund, without comment.  The fact that the IRS accepted her amended return demonstrates that Himple's position that capitalization of interest does not change its character from interest to principal is correct.  After all, only interest is deductible, principal is not.

165. Having been properly claimed by Himple as mortgage interest, these

**THIRD AMENDED CLASS ACTION COMPLAINT**

amounts should have been so allocated by BANA pursuant to its contractual agreement with Himple. When BANA did not do that allocation, it breached the contract.

166.   As a result of BANA's breach of contract and failure to properly allocate her mortgage payments for tax years 2011, 2012, 2013 and 2014, Himple was damaged in that she had to retain counsel, and then an accountant to file amended tax returns and she has actually paid the accountant for services in correcting the mortgage deduction on her returns.

167.   Plaintiffs allege that the breach of contract is not limited to their individual Loan Documents and Modification.  Plaintiffs allege that the Loan Documents used by BANA, or its predecessors, are essentially "form", "standardized", "industry-wide" documents consisting of Adjustable Rate Notes and Deeds of Trust. [30]  As such, the language contained therein is virtually uniform, and, as quoted in ¶ 124, supra**, the language is used to set a uniform, national policy.**[31]

168.   Plaintiffs allege that at a time unknown, but approximately in 2009, BANA made a conscious decision to breach the Loan Documents and Modifications it had entered into with **all** borrowers that obtained Modifications at a time where their Unpaid Principal included not only the unpaid borrowed principal, but also unpaid or

---

[30] Ex. A (Note) is identified by a form name "PayOption ARM Note-MTA Index FE-5312 (0511), Ex. B (Deed) is identified by a form name "CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT-Form 3005 1/01, Ex. C (Modification) is identified by a form name " MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT-Single Family-Form 3157", Ex. D (Note)  is identified by a form name " MULTISTATE FIXED/ADJUSTABLE RATE NOTE-LIBOR-SIX MONTH-INDEX-10 Year-Interest Only-Period", Ex. E (Deed) is identified by a form name "CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT-Form 3005 1/01".

[31] THE SECURITY INSTRUMENT combines **uniform covenants** for *national use* and non-uniform covenants with limited variations by jurisdiction to constitute a **uniform security instrument** covering real property.

1    deferred mortgage interest.

2         169.   Although the Loan Documents and the Modification document never

3    discuss or address the fact that **after the Modification** BANA will not consider the

4    proceeds it receives to pay the interest on the borrowed Principal that was charged and

5    remained unpaid at the time of the Modification, it did exactly that!  BANA

6    implemented a policy that "once interest has been capitalized (added to the principal),

7    **it is no longer considered interest** and is simply part of the principal balance." **No**

8    **longer considered interest by who? BANA?   The IRS, however, clearly**

9    **"considers" such to be interest as evidenced by its acceptance of Himple's**

10   **amended returns.   The fact is that** BANA arbitrarily, unilaterally and without

11   notice to any borrower, adopted that position by fiat.  And once BANA adopted that

12   position, since at least 2009, it continually breached its Contract with Plaintiffs and all

13   Class members by not allocating payments received from borrowers first to "interest"

14   and then to Principal.  BANA unilaterally and arbitrarily failed to allocate proceeds

15   received from all borrowers and Class members in accordance with the clear,

16   unambiguous terms of the Loan Documents.  Rather, it allocated the proceeds

17   according to its own undisclosed internal policy, which is in breach of the contract.

18        170.   Therefore, not only have Plaintiffs been damaged by this breach, but all

19   Class members that made payments to BANA and did not have their proceeds

20   properly allocated have lost the benefit of their true mortgage interest deduction

21   because the improper allocation was done on a systemic and company wide basis

22   pursuant to an internally stated policy.  Class members have either overpaid taxes

23   and/or have incurred costs to have their accountants review the improper allocation by

24   BANA.

25        171.   Plaintiffs seek to have BANA properly allocate the payments it received

26   from Plaintiffs and Class members between interest and principal and thereafter

27   inform Plaintiffs and Class members of the correct allocation, or, alternatively to pay

28   the cost of making such proper allocation for Plaintiffs and all Class members.

**THIRD AMENDED CLASS ACTION COMPLAINT**

Plaintiffs also seek to have BANA pay the cost for Plaintiffs and Class Members to determine if their filed tax returns are correct, and to amend any tax returns that may result in a greater tax refund when using the correct interest deduction.  To the extent the statute of limitations has passed on any filed returns and Plaintiffs or Class members cannot amend their return, then to pay the damages, equivalent to the benefit lost, from not being able to take the full mortgage interest deduction. [32]

## COUNT II

## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

172.   Plaintiffs re-allege and hereby incorporate each and every allegation contained in Paragraphs 1 through 171 of this Third Amended Complaint as though fully set forth herein.

173.   There is an implied covenant of good faith and fair dealing in every contract that neither party will do anything to prevent the other from receiving the benefits of the agreement.

174.   Notwithstanding Plaintiffs' allegations herein that BANA breached the contract, Plaintiffs' **separately** allege that BANA breached the implied covenant of good faith and fair dealing for the reasons set forth in the preceding paragraphs and more fully detailed below. Plaintiffs allege that, under California law, even if a fact finder concludes that BANA did not breach the consensual terms of the contract, BANA **can still be liable** to Plaintiffs and the Class members for the breach of the implied covenant of good faith and fair dealing by frustrating a benefit of the contract. Accordingly, Plaintiffs plead this theory as an alternative theory of recovery, separate and apart from the breach of contract claim, and alleges BANA frustrated one of the benefits of the home mortgage contract - - the ability to obtain a tax deduction for the payment of mortgage interest.

175.   The nature of the contractual relationship is set forth in Exs. A through F. In summary, BANA is a lender that had acquired Plaintiffs' original Option Arm Loans.

---

[32] Similar to the Settlement entered into by BANA in the case entitled *Horn v. Bank of America* 12-cv-1718-GPC (USDC-SDCA)

It did not originate them.  In its acquisition, BANA took the loans subject to the original or controlling Loan Documents at the time.  These two documents formed the contractual relationship between BANA and Plaintiffs (hereafter "Contract"). These operative documents were subsequently modified through a BANA initiated Modification.

176.  Plaintiffs and Class members, like many prospective home purchasers, acquired their home for the investment purpose of owning their own living accommodations as opposed to renting them as well as obtaining a tax benefit by financing the cost of the home through a mortgage and paying interest to the lender. *One of the primary purposes of financing the cost of a home, and one of the major benefits of the mortgage contract, is that the borrower can take a mortgage interest deduction on a tax return, thereby lowering the borrower's tax liability.*  BANA is aware that Plaintiffs, and borrowers generally, rely on BANA's proper reporting of interest paid on the mortgage so the borrower may enjoy the benefit of the tax deduction under the mortgage contract.

177.  Thus, the proper allocation of proceeds paid to BANA by its borrowers is an important service component of the Contract.   In order for Plaintiffs, and borrowers/Class members to obtain the full benefit of the mortgage interest tax deduction that is integral to the borrowers legitimate expectations that they will realize the full benefit of the tax benefit of owning a home, BANA must properly allocate the proceeds it receives between principal and interest, since the borrower only gets the benefit of a tax deduction for mortgage interest, not principal, payments. After proper allocation, BANA files a Form 1098 with the IRS and sends a copy to its borrowers. The IRS, borrowers and accountants rely on BANA's proper reporting of interest it has received from the borrower when completing tax returns.

178.  The allocation of payments between interest and Principal is a term of the Loan Documents. Smith's Note contains the following language: Each monthly payment will be applied to interest before principal". Ex. A, ¶3.  Himple's Note contains the following language: "Each monthly payment will be applied as of its scheduled due date,

and if the payment includes both Principal and interest, it will be applied to interest before Principal".  Ex. D, ¶3.

179.   The allocation of payments between interest and Principal is also a term of the Deed.

"THE SECURITY INSTRUMENT combines **uniform covenants** for *national use* and non-uniform covenants with limited variations by jurisdiction to constitute a **uniform security instrument** covering real property.

*UNIFORM COVENANTS*. **Borrower and Lender covenant and agrees as follows:**

2.    Allocation of Payments or Proceeds.  Except as otherwise described in this Section 2, ***all payments*** accepted and applied by Lender ***shall*** be applied in the following order of priority: (1) interest due under the Note; (b) principal due under the note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal of the Note.   (Emphasis added) (Ex. B ¶1, 2 at pps 3-4, Ex. E ¶1, 2 at pps 3-4).

180.   As these covenants are part of the uniform covenants applied nationally, Plaintiffs allege that they apply to all Class members.   Plaintiffs further allege all provisions of the Contract were in full force and effect at all times that Plaintiffs and Class members made mortgage payments to BANA that included the payment of interest

181.   Plaintiffs allege, on their behalf and on behalf of Class members that this allocation of proceeds is an important benefit of the Contract.  In the context of an Option Arm Loan, where substantial unpaid interest may have accumulated and, borrowers, like Plaintiffs, enter into an agreement whereby they make arrangements with BANA to pay back the deferred and unpaid interest over time, the borrower only receives the benefit of the mortgage interest deduction when the proceeds are properly allocated, but does not when the proceeds are improperly allocated.

182.   Mortgage interest is only deductible in the year in which it is paid, so it is very important that the allocation of proceeds received by BANA be done properly and in accordance with the Contract so each year, Plaintiffs and Class members may take the

1    proper deduction.

2         183.   BANA offered each Plaintiff the opportunity to modify their existing Option

3    Arm Loan. This was through a nationally marketed loan modification program BANA

4    offered to its current borrowers.   In essence, the modification would convert the Option

5    Arm Loan, which may have had fluctuating interest rates, and the ability to defer payment

6    of full principal and full interest to a later date resulting in a negative amortization of the

7    loan balance, to a fixed loan, at a lower rate, and over a longer period of time.  The loan

8    modification would result in a new payment plan whereby the borrower would repay any

9    unpaid original Principal balance and any unpaid or deferred interest. But the "option"

10   component of the original loan would be terminated, and there would be fixed interest

11   rates and monthly payments.

12        184.   This program was very beneficial to BANA because it could now

13   capitalize the unpaid interest, meaning it could now charge "interest" on the "unpaid

14   Interest."  It also benefitted BANA by avoiding the substantial costs and uncertainties

15   of foreclosures.   Indeed, BANA was under no obligation to agree to any loan

16   modification.  It was strictly BANA's business decision based on its interests only that

17   led to Plaintiffs' loans being modified.

18        185.   BANA exclusively dictated the terms of the Modification offer to Plaintiffs

19   and they were prepared on standardized forms used by BANA.  There was no negotiation

20   of the terms between Plaintiffs and BANA.

21        186.   The offer further made it very clear that all of BANA's rights under the

22   original Contract remained in place, in full force and effect.  Plaintiffs were bound by the

23   terms of the Contract, except as specifically modified by the separate Modification

24   agreement.

25        187.   This "offer" provided at least two benefits to Plaintiffs, as it does to Class

26   members generally. First, it it allowed them to "catch up" and pay off their deferred

27   mortgage interest, and start paying down the Principal so their equity in their home might

28   increase. Second, many borrowers were now in a different financial position than they

were at the time they chose to purchase a home with an Option Arm Loan.  They were now able to make full principal and interest payments and could repay their deferred interest, along with current interest, under a new payment plan. Indeed, unless BANA believed that a borrower could succeed in paying off their loan under the modified terms, BANA would not offer the borrower a modification.  So, once BANA allocated the *payment* or *proceeds* in accordance with the Contract as set forth above, Plaintiffs and Class members could receive a mortgage interest tax deduction as they repaid the actual interest they had been charged but which they were able to defer.

188.   At no time prior to Plaintiffs or Class members accepting the Modification did BANA advise them that through an internal process, it unilaterally altered, changed and modified its procedure for allocating proceeds it receives from borrowers that had Option Arm Loans and modified those loans. At no time were they informed or advised that BANA intended to disregard the allocation provisions in the Note(s) as well as the UNIFORM COVENANT allocation provisions of the Contract found in the Deed.

189.   Plaintiffs and Class members performed all they were required to do under the Contract as modified by the Modification.

190.   BANA, knowing that a portion of Plaintiffs' monthly payments paid both accrued interest for the month, as well as unpaid deferred interest, nevertheless failed to allocate the payments properly.  Plaintiffs allege that BANA, at all times, knew that it was not properly allocating the payments it received, but intentionally failed to advise Plaintiffs and Class members so they could take steps to protect their interests and report the full amount of mortgage interest paid to BANA.

191.   While Plaintiffs allege that BANA has breached the terms of the Contract (Loan Documents and Modification) in disregarding the Contract's allocation provisions, **Plaintiffs further allege breach of a specific provision of the Contract is not necessary for their claim of breach of the implied covenant of good faith and fair dealing. Plaintiffs therefore allege** BANA has, in fact, separately and independently, breached the covenant of good faith and fair dealing with respect to their mortgage

1   Contract.

2       192.   Even if BANA did not breach the Contract, which Plaintiffs will

3   demonstrate it did, Plaintiffs allege that, to the extent BANA claims that either under the

4   Note, Deed or Modification, it possessed, maintained and had the *unilateral* right to

5   amend the Contract governing its relationship with Plaintiffs and Class members,

6   permitting it to change the allocation provisions of payments or proceeds it receives from

7   borrowers, that right is constrained by the covenant of good faith and fair dealing which

8   precludes amendments or changes that operate retroactively to impair accrued rights.

9       193.   Plaintiffs allege that, to the extent BANA contends it had "discretionary

10  power" to change the allocation of *payments* or *proceeds* made by Plaintiffs under their

11  Contract with BANA, that power was not exercised in good faith.  Plaintiffs and Class

12  members entered into loan agreements, which required they pay interest for the use of

13  the money.  The loan agreements allowed them to borrow the money on the date their

14  loan closed and pay interest on a payment schedule.  Under the Option Arm Loans, they

15  did not have to pay all interest when it became due, but could "defer" interest and pay

16  it at a later date.  However, whenever the interest would be paid, it would be mortgage

17  interest and would be deductible on the borrower's tax return only in the year it was paid.

18      194.   However, unbeknownst to Plaintiffs and Class members, years after the

19  original loan contracts were entered into, and in conjunction with BANA's market loan

20  modification program, BANA apparently decided to change the terms of the Loan

21  Documents, on which Plaintiffs and Class member relied, and change the nature and

22  character of unambiguous interest payments.  As of 2009, BANA decided that capitalized

23  interest would "no longer be" interest.  BANA never provided notice to Plaintiffs or to

24  Class members that an undisclosed term of the Modification would be that BANA was

25  going to change the allocation provisions of the Contract and eliminate the mortgage

26  interest tax deduction benefit Plaintiffs and Class member were entitled to receive.

27      195.   Plaintiffs, on their behalf and on behalf of Class members, allege that actions

28  in changing the allocation provisions provided in the Contract without any notice to

Plaintiffs or Class members were not the result of an honest mistake or bad judgment, but rather by a conscious and deliberate act.  One of the benefits afforded to Plaintiffs and Class members of having a mortgage with BANA is that they receive a tax deduction for the interest paid. By changing this allocation, the interest benefit of the Contract is lost.

196.   BANA knowingly and intentionally changed the allocation provisions of the Contract after the Plaintiffs and Class members entered into a Modification of their loan which did not mention or disclose that the mortgage interest deduction for all unpaid, deferred mortgage interest, would now be "lost" when the interest was paid because, in the eyes of BANA "it is no longer considered interest". Ex. G. Plaintiffs allege BANA has refused, to this date, to tell them or Class members why it is "no longer considered interest".  Plaintiffs allege the real reason behind the change is for the benefit of BANA.

197.   In the event a finder of fact concludes there was no breach of contract, Plaintiffs allege it may still find a breach of the implied covenant of good faith and fair dealing.  At all times in the context of the Modification, BANA was in a superior bargaining position, as evidenced by the fact it dictates all the terms of a Modification. Plaintiffs allege BANA is aware Plaintiffs and Class members seeking this relief are quite vulnerable and facing serious financial concerns. BANA knows this because the Plaintiffs and Class members disclose their vulnerability through submission of financial information, telephone calls and writings, seeking the unilateral offer from BANA, which it may or may not extend, based on the financial benefit to BANA.  BANA requires Class members to expose their vulnerability before making an offer to them.

198.   However, neither in the offer itself nor in any communication from BANA, were Plaintiffs asked to change, modify, alter or waive the allocation provisions in the Contract and give up the mortgage interest deduction so BANA could benefit itself in some manner with a different allocation. Having elected not to change the allocation provisions of the Contract as part of the terms and conditions of the Modification, BANA must live by its decision – and the original allocation provisions.  Plaintiffs further allege

1   if there is no breach of contract, then, alternatively, damages awarded for the breach of
2   the covenant of good faith and fair dealing provide the remedy for Plaintiffs and Class
3   members for frustrating the tax benefit of the mortgage agreement.

4       199.   When Plaintiff Himple did not receive a correct Form 1098 from BANA,
5   Plaintiff Himple requested BANA issue one as part of BANA's responsibility to
6   administer Plaintiff's loan.   Plaintiff Himple alleges BANA failed and refused to
7   discharge its legal and contractual responsibility in issuing to Plaintiff Himple a correct
8   Form 1098. On information and belief, Plaintiffs allege other borrowers made the same
9   request.  BANA has refused to correct its wrongful conduct because it takes the position
10  once interest is capitalized "it is no longer considered interest".  Such a position has no
11  basis in fact or in the law, and is an arbitrary and unilateral position taken by BANA,
12  undisclosed to its borrowers, solely for the benefit of BANA and to the detriment of its
13  borrowers.   Plaintiffs allege BANA's conduct was arbitrary and in violation of
14  established tax law as more fully explained in footnotes 4-8, *supra.*

15      200.   As a result of the foregoing acts of BANA, even if said acts were not in
16  breach of the Contract, it breached the covenant of good faith and fair dealing, depriving
17  Plaintiffs and Class members of the contractual benefit of a mortgage interest tax
18  deduction, as well as damages in having to investigate and, where possible, correct the
19  wrongful allocation of payments and proceeds. Plaintiffs were damaged in relying on the
20  wrongful allocation of payments on Form 1098 and did not take the appropriate mortgage
21  interest deductions for each year they received incorrect Forms 1098. When filing tax
22  returns for each year BANA failed to properly report the correct mortgage interest it had
23  received, Plaintiffs and Class members paid more in taxes than they would have paid if
24  they had taken the mortgage interest deduction in the year the mortgage interest was paid
25  to BANA.  Plaintiffs suffered additional damages by incurring the cost of hiring an
26  accountant to work with them to possibly correct the wrongful allocation by BANA and
27  to amend, where possible, previously filed tax returns.

28

201.   As alleged above, the actions and conduct of BANA were not by accident or mistake, nor were they unintentional.  Plaintiffs allege that BANA has a motive and reason for changing the allocation provisions of the mortgage payments, as well as the nature and characterization of unpaid mortgage interest which Plaintiffs allege is solely for the benefit of BANA and to the detriment of Plaintiffs and Class members. It is further alleged that BANA acted intentionally and with knowledge that its reporting policies were in violation of law and took its actions notwithstanding that knowledge so as to maximize its own profits by avoiding the cost of reporting.

202.   The conduct of BANA is not only in bad faith but also fraudulent and malicious as it secretly changed the characterization of interest that had been incurred, and was/would be tax deductible when paid.  BANA never told its borrowers of the change, and knew at all times that the failure to allocate proceeds from a mortgage payment properly to interest first and then Principal would deprive borrowers of a significant benefit of their loan, as well as to cause them financial harm.

203.   BANA's conduct was also malicious because BANA knew that Plaintiffs and Class members would not necessarily understand the implications of the allocation provisions in the Contract. Further, BANA knew that borrowers regularly ask BANA to explain positions taken by BANA, as evidenced by Ex. G, and BANA knew borrowers, like Plaintiffs and Class members would be misled by BANA's affirmative (but wrong) declaration that pre-modification interest was "considered" principal post-modification. BANA acted affirmatively and in bad faith by silently changing the allocation provision of the payments and proceeds, and changing the character of interest payments, without Plaintiffs and Class members recognizing the change in the reported interest on Form 1098. As a result of this fraudulent and malicious conduct, Plaintiffs and Class members seek punitive damages against BANA.

## COUNT III

## UNFAIR/DECEPTIVE BUSINESS PRACTICES

204.   Plaintiffs re-allege and hereby incorporate each and every allegation

contained in Paragraphs 1 through 203 of this Complaint as though fully set forth herein.

205.   California Business & Professions Code § 17200 et seq. ("UCL") prohibits acts of unfair competition, including any "unlawful, unfair or fraudulent business act or practice."

206.   As alleged above, BANA has been violating the terms of 26 U.S.C. § 6050H by failing to include payments of mortgage interest that were actually made by Plaintiffs and Class members and also in failing to disclose to them that a consequence of entering into their loan modification agreements would be that BANA would no longer correctly report the amount of mortgage interest Class members paid on Forms 1098 by excluding payment of deferred interest from Forms 1098. BANA's practices constitute an unlawful, unfair and fraudulent business practices under the UCL and would also constitute violations of similar consumer protection laws in applicable in the several United states.

207.   However, in the event that the Court determines that the UCL either cannot be applied in these circumstances outside of California, or that the differences between the laws of the several states and California's UCL as so substantial as to make the administration of a class action unmanageable, then Plaintiffs assert that a separate subclass of California borrowers should be certified for at least Plaintiffs' UCL claim and any others for which it is appropriate.  This class would be defined in the same manner as the main class, but would be limited to Class members with loans secured by real property located in California.

208.   Plaintiffs have suffered losses of money or property as a result of defendants' unlawful, deceptive and unfair business practices as alleged herein and will incur future losses as a result of having to amend their tax returns.  As a result of defendants' violations of the UCL, Plaintiffs and Class members are entitled to bring this claim for injunctive and other equitable relief.  The specific equitable relief they request is stated in their prayer (below).

## COUNT IV

## DECLARATORY RELIEF

209.   Plaintiffs re-allege and hereby incorporate each and every allegation contained in Paragraphs 1 through 208 of this Complaint as though fully set forth herein.

210.   An actual controversy has arisen and now exists between Plaintiffs and BANA regarding the manner in which BANA accounts for payments of deferred and unpaid interest that existed on its borrowers' accounts as of the time they had their loans modified as alleged above.

211.   Plaintiffs and the Class members contend that BANA, pursuant to the terms of terms of its contract, its obligations under the Internal Revenue Code and its written policies and procedures, to properly calculate and report on Form 1098 the amount of interest paid to it by its borrowers. Plaintiffs further contend BANA takes the position that the loan modification agreement, a written document, changes and alters the terms of the written loan agreements, and its policies and procedures, so that BANA does not have to report on Form 1098 all the mortgage interest borrowers pay in a given year.  Plaintiffs contend BANA has maintained policies whereby it wrongfully concealed from Class members that as part of their loan modification, BANA would eliminate the deferred and unpaid interest on their accounts.  Plaintiffs further allege that BANA did this for its own advantage.  Plaintiffs have demanded that BANA issue them correct Form 1098s and BANA has refused.

212.   An actual controversy exists since Plaintiffs and Class members contend BANA is required, under the written policies and practices of BANA, the written loan agreement and the written loan modification, to allocate monthly loan payments properly between current interest, deferred interest and principal and to properly report the payment of interest to the IRS and Class members on Form 1098.  BANA disputes this and contends it has no obligation to properly report the receipt of interest payments from Class members to the IRS or the Class members.

213.   A declaratory judgment is necessary to immediately resolve the issue as to whether BANA is correctly reporting Class members' mortgage interest payments on Form 1098s and whether BANA should be required to provide corrected 1098 forms to the Class members for all years in which its policies did not conform to law.

214.   Without such a declaratory judgment, Plaintiffs will not be able to recover the damages as alleged herein and Class members, consisting of tens of thousands of borrowers who have no knowledge of BANA's wrongful and illegal conduct, will continue to rely on the improper Forms 1098 prepared by BANA and will be deprived of taking the full mortgage interest deduction for each of the past, and for the future, years.

215.   Wherefore, declaratory relief is necessary and proper in this matter.

## COUNT V
## FRAUD

216.   Plaintiffs re-allege and hereby incorporate each and every allegation contained in Paragraphs 1 through 215 of this Complaint as though fully set forth herein.

217.   As alleged previously, BANA knowingly and intentionally concealed from Plaintiffs and the other Class members that a consequence of proceeding with their loan modifications would be that BANA would "convert" all deferred and unpaid interest into "principal" and that BANA would not report that interest on the borrower's Form 1098 when it was repaid.  BANA intentionally concealed its policy from its borrowers for its own benefit as alleged previously.  The information BANA concealed was material to Plaintiffs in that had they known the true facts, they would have acted differently than they did.

218.   BANA was under a legal duty pursuant to 26 U.S.C. §6050H to report accurately the interest BANA "received" during each calendar year and it was further under a duty to correct any mistakes on Forms 1098 as soon as possible after determining that a wrong amount had been reported.

219.  BANA knew that its concealment of the facts relating to its wrongful interest reporting would be relied upon by Plaintiffs and the Class members (and the IRS).

220.  Plaintiffs and the Class members did not know about BANA's improper and illegal reporting, and, even if some tiny percentage may have figured it out, they were still powerless to avoid being damaged by BANA's fraud because of the IRS' policy of rejecting any returns where the amount of interest claimed did not match the amount of the lender-issued Form 1098.

221.  BANA knew that Plaintiffs and the Class members' reliance on the incorrect Forms 1098 would cause detriment to the Plaintiffs and the Class members both in terms of the (1) inability (due to the passage of time) to correct BANA's over-reporting of interest in years prior to 2011, and (2) in the failure to take deductions for the interest that Plaintiffs and Class members paid in 2011 and later years that BANA unilaterally decided not to report in violation of 26 U.S.C. § 6050H.

222.  As a direct and proximate result of BANA's multiple concealments, Plaintiffs and the Class members have been damaged in an amount according to proof.

223.  BANA's fraudulent concealment was undertaken with a conscious disregard of its effect on Plaintiffs and the Class members and in a manner shocking to the conscience such that punitive damages should be awarded.

## COUNT VI
## NEGLIGENCE

224.  Plaintiffs re-allege and hereby incorporate each and every allegation contained in Paragraphs 1 through 223 of this Complaint as though fully set forth herein.

225.  BANA owed a legal duty under both California and federal law to calculate correctly the aggregate amount of mortgage interest that Plaintiffs paid to it in each calendar year in which BANA was their mortgagor and to report the amount of that interest to them on Form 1098.

2:14-cv-06668-DSF-PLA   Document 69   Filed 07/30/18   Page 62 of 63   Page ID #:1832

226.   BANA was negligent in breaching this duty as specified above.

227.   As a direct and proximate cause of BANA's negligence, Plaintiffs were injured in the form having to pay additional accountancy fees to correct BANA's error and/or in paying more tax than they otherwise would have paid as specified above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs on behalf of themselves and all Class members, pray for judgment and injunctive and equitable relief against BANA as follows:

(a)   Certification of the classes pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiffs as the representatives of the classes (and for the California sub-class (if necessary)), and designating Plaintiffs' counsel as counsel for the class (and subclass if necessary);

(b)   A judicial declaration that BANA has committed the violations alleged herein;

(c)   For general and special damages in an amount to be proven at time of trial, including, but not limited to, accountancy fees necessary to amend their tax returns and/or to determine the value of any lost deductions, and the value of the lost deductions;

(e)   For punitive or exemplary damages on all causes of action where appropriate;

(f)   For an order enjoining BANA from issuing any IRS Form 1098s that do not account for its receipt of unpaid or deferred interest received from its borrowers and that BANA be compelled to issue corrected 1098 forms to all Class members for all years in which it has done so wrongfully and for which there is still sufficient time for Class members to amend their tax returns for that year.  Plaintiffs further request that as part of its equitable powers, the Court order BANA to pay for the accounting fees necessary

for all Class members to amend their tax returns should they wish to do so to correct BANA's error.

(g)    An order in equity (if no damages are awarded) requiring BANA to pay any accountancy expenses to Class members necessary to determine if Class members lost money as a result of BANA's mis-reporting of mortgage interest on their Forms 1098;

(h)    Prejudgment interest at the legal rate;

(j)    Attorney's fees according to proof at time of trial;

(k)    Costs of suit, including expert witness fees and costs, herein incurred;

(l)    For such other and further relief as this Court may deem proper and just;

## JURY TRIAL DEMAND

Plaintiffs and all those similarly situated hereby demand a trial by jury for all issues so triable and if any arbitration clause is asserted by defendant, on the issue of whether a valid arbitration agreement exists.

Date: July 27, 2018                LAW OFFICE OF DAVID J. VENDLER


By: _____*/s/ David J. Vendler*_____
                 David J. Vendler

MICHAEL R. BROWN, APC


By: _____*/s/ Michael R. Brown*_____
                 Michael R. Brown

Attorneys for Plaintiffs Cynthia Himple, Lora Smith and all others similarly situated

-63-